**COMMONWEALTH of Pennsylvania,
Appellee,**

v.

**Maurice WATKINS, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 28, 1999.

Filed March 21, 2000.

John Elash, Pittsburgh, for appellant.

Michael Streily, Deputy Dist. Atty., Pittsburgh, for Commonwealth, appellee.

Before POPOVICH, JOYCE, and BROSKY, JJ.

POPOVICH, J.:

¶ 1 This is an appeal from the judgment of sentence entered on November 18, 1998, in the Court of Common Pleas of Allegheny County. Appellant was convicted of voluntary manslaughter and sentenced to five to ten years of imprisonment. Appellant filed a timely notice of appeal. Upon review, we reverse the judgment of sentence and remand for a new trial.

¶ 2 Herein, appellant asks the following:

I.  WHETHER THE TRIAL COURT ERRED IN FINDING THAT APPELLANT'S CONFESSION WAS NOT THE FRUIT OF AN ILLEGAL ARREST AND DETENTION MANDATING SUPPRESSION.

II. WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS HIS CONFESSION AS BEING INVOLUNTARILY OBTAINED IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS.

III. WHETHER THE TRIAL COURT ERRED IN REFUSING TO SUPPRESS APPELLANT'S CONFESSION WHICH WAS THE PRODUCT OF AN UNNECESSARY DELAY BETWEEN ARREST AND ARRAIGNMENT.

IV. WHETHER THE TRIAL COURT ERRED IN PERMITTING THE COMMONWEALTH TO INTRODUCE EVIDENCE OF APPELLANT'S WILLINGNESS TO TAKE A POLYGRAPH EXAMINATION.

Appellant's brief, at 4.[1]

¶ 3 The record reveals the following: On May 3, 1993, Bernard "Blade" Washington was killed by a single gunshot wound to the head at approximately 2:00 p.m. Mr. Washington's body was discovered by two individuals who called the police. Homicide Detectives Dennis Logan and David Moore responded to the call and secured the location where Mr. Washington's body was found. Detectives Logan and Moore were unable to locate a weapon or any eyewitnesses. The case remained unsolved for four years.

¶ 4 On May 2, 1997, Homicide Detective Richard McDonald, acting on information provided by Detective Foley, obtained a court order to allow the transportation of appellant from the Allegheny County Jail to the homicide office of the Pittsburgh Police Department ("police station"). Detective Foley informed Detective McDonald that he was informed by a confidential informant that appellant might have firsthand knowledge concerning Mr. Washington's death. After obtaining the court order, Detective McDonald and his partner arrived at the Allegheny County Jail at 6:20 p.m. and transported appellant, who was serving time for an unrelated drug offense, to the police station.

¶ 5 Upon arriving at the homicide office at approximately 6:38 p.m., appellant was placed in an interrogation room. At 6:46 p.m., Detective McDonald informed appellant that he was a suspect in the murder of Mr. Washington and read a Pre–Investigation Warning Form to appellant that served to inform appellant of his *Miranda* rights. Appellant read the Pre–Investigation Warning Form and signed a form that indicated the waiver of his *Miranda* rights. The interrogation commenced at 6:49 p.m. Initially, appellant denied any

---

**1.** Appellant's questions are renumbered for editorial convenience.

involvement in the death of Mr. Washington. Appellant continued to deny any involvement and offered to take a polygraph test. Detective McDonald promptly replied to appellant that a polygraph test would be made available to him. At this point, appellant altered his initial denials and informed Detective McDonald that he witnessed an unknown individual kill Mr. Washington on the night in question.

¶ 6 Detective McDonald stopped the interrogation at 8:36 p.m. in order to allow appellant to take a polygraph examination. The polygraph test was set up from 8:40 p.m. to 9:30 p.m. Appellant was not questioned during the actual set-up. During this hiatus in questioning, appellant was provided with chips, soda and a cigarette. The test was administered three times, in accordance with police procedure, from 9:30 p.m. to 11:10 p.m. The interrogation resumed at 11:20 p.m., and appellant was informed that he failed the polygraph test. Appellant confessed to the murder of Mr. Washington at approximately 11:40 p.m., and was arrested at approximately midnight. At 12:13 a.m., appellant declined to tape record his confession, but he signed and adopted the notes taken by Detective McDonald that contained appellant's confession. Appellant was arraigned at 3:25 a.m. and returned to the Allegheny County Jail shortly thereafter.

¶ 7 The Pennsylvania Supreme Court set forth the standard for reviewing a suppression motion as follows:

> [W]e must first determine whether the factual findings are supported by the record, and then determine whether the inferences and legal conclusions drawn from those findings are reasonable. We may consider the evidence of the witnesses offered by the prosecution, as verdict winner, and only so much of the defense evidence that remains uncontradicted when read in the context of the

record as a whole. We are bound by facts supported by the record and may only reverse if the legal conclusions reached by the court below were erroneous.

*Commonwealth v. Luv*, 557 Pa. 570, 575, 735 A.2d 87, 90 (1999) (citations omitted). We begin by addressing appellant's initial contention that his confession should be suppressed since it was the fruit of an illegal arrest.[2] Appellant argues that the functional equivalent of arrest occurred when Detective McDonald transported him from the jail to the police station and that this arrest lacked sufficient probable cause. We find this argument without merit.

¶ 8 There are three levels of interactions between citizens and law enforcement officers recognized under Fourth Amendment jurisprudence:

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Schatzel*, 724 A.2d 362, 365 (Pa.Super.1998), *appeal denied*, 559 Pa. 703, 740 A.2d 232 (1999) (citing *Commonwealth v. Ellis*, 541 Pa. 285, 294, 662 A.2d 1043, 1047 (1995)). "Police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest." *Commonwealth v. Mannion*, 725 A.2d 196, 200 (Pa.Super.1999) (citations omitted). The

---

**2.** The "fruit of the poisonous tree" doctrine excludes evidence obtained from, or acquired as a consequence of, lawless official acts. *See Wong Sun v. United States*, 371 U.S. 471, 83

S.Ct. 407, 9 L.Ed.2d 441 (1963); *see also Commonwealth v. Brown*, 700 A.2d 1310 (Pa.Super.1997).

following factors are used to determine, under the totality of circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest: "the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions." *Id.* (citing *Commonwealth v. Busch*, 713 A.2d 97, 101 (Pa.Super.1998)).

■ ¶ 9 First and foremost, the present case does not involve an interaction between a free citizen and a law enforcement officer. Appellant was a prisoner serving time in jail during his encounter with the police. Appellant was in custody well before he was transported by Detective McDonald and his partner to the police station. The only change in status that occurred with appellant was the location of his custody. The concepts espoused in *Schatzel, supra,* and *Mannion, supra,* apply only to citizens who bear the risk of having his or her freedom curtailed to some degree by a law enforcement officer. When transported by Detective McDonald and his partner, appellant was already experiencing the curtailment of his freedom in the form of incarceration. Therefore, appellant is not entitled to the same considerations that apply to citizens under the Fourth Amendment. However, it is not our intent to diminish the rights afforded prisoners during custodial interrogation. *See Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968)(an inmate who is questioned by government agents in connection with a case for which he or she is not in custody is still entitled to *Miranda* warnings).

¶ 10 In addition to appellant not being afforded the same rights as citizens under the Fourth Amendment, we view the transportation of appellant to the police station for questioning, pursuant to a court order, as an administrative process. This procedure is merely a manner in which police can have access to a prisoner. The case of *Commonwealth v. Karash*, 513 Pa. 6, 518 A.2d 537 (1986), which involved a challenge to the legitimacy of the practice of transporting individuals in pretrial detention to police stations for custodial interrogation, illustrates our treatment of the process in which appellant was transported from the jail to the police station.

■ ¶ 11 The defendant in *Karash, supra,* argued that the transportation of individuals in pretrial detention from a holding facility to a police station for custodial interrogation should not be permitted without a "prior counseled adversarial hearing." *Karash*, 518 A.2d at 538. The Pennsylvania Supreme Court focused on the custodial interrogation of the defendant in *Karash, supra,* and whether the defendant's Fifth Amendment right against self-incrimination was upheld. Our Supreme Court stated the following:

> We therefore conclude that the fact that an administrative procedure was employed to facilitate appellant's availability for custodial questioning does not in and of itself affect the character of the custodial questioning nor does it impact upon the rights to which the appellant was entitled during the custodial interrogation.

*Id.*, 518 A.2d at 540. The Pennsylvania Supreme Court continued to identify this transportation procedure as "the administrative vehicle through which the movement of a prisoner is facilitated." *Id.*, 518 A.2d at 541. Our Supreme Court also held that the defendant's Sixth Amendment right to counsel was not triggered by his transportation since the state had yet to make a commitment to prosecute the defendant concerning the substance of his custodial interrogation. *Id.*, 518 A.2d at 540–541. "The process by which the movement is effectuated is a neutral fact; what is of constitutional significance is the purpose for which it is employed and when it is employed." *Id.*, 518 A.2d at 541.

¶ 12 Due to the administrative nature of the transport process used by the police herein and the fact that prisoners' Fourth Amendment rights are not coextensive with those of free citizens, we decline to require police officers to possess probable cause when transporting prisoners to police stations for custodial interrogation. Consequently, the transportation of appellant by Detective McDonald and his partner did not amount to the functional equivalent of arrest. Appellant's emphasis upon his transportation from the jail to the police department is misplaced. Instead, the emphasis should have been placed upon the purpose for which this administrative process was employed as well as when it was employed.

¶ 13 Appellant's next argument is that his confession should be suppressed since it was not voluntary. Our Supreme Court set forth the following standard for determining the voluntariness of confessions:

> Voluntariness is determined from the totality of the circumstances surrounding the confession. The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily.

*Commonwealth v. Nester*, 551 Pa. 157, 163, 709 A.2d 879, 882 (1998) (citations omitted). "When assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion." *Id.*, 709 A.2d at

882 (citing *Commonwealth v. Jones*, 546 Pa. 161, 683 A.2d 1181 (1996)).

¶ 14 The totality of the circumstances here demonstrate that appellant's confession was voluntary. Appellant argues that his confession was involuntary due to the duration in which appellant was in custody, the fact that appellant was shackled during his interrogation and the fact that appellant took a polygraph test. Although appellant was in police custody for nearly nine hours, appellant was subjected to only three hours and twenty-nine minutes of actual interrogation. It is not clear whether appellant was shackled during his interrogation; however, this is a standard practice employed by the police due to previous attempted escapes. Since appellant was in custody for another offense at the time of the interrogation and left alone during breaks in the questioning, the securing of appellant by the police reflected prudent police conduct rather than coercive conduct. With respect to the polygraph test, appellant volunteered to take it without any prompting by the police. In addition, we note that appellant was fully informed of his *Miranda* rights and made a knowing and voluntary waiver of those rights. Furthermore, appellant asserts no specific misconduct in the form of physical or psychological intimidation by the police.

¶ 15 Appellant's final argument in support of his efforts to suppress his confession is that the confession was obtained outside the period established for prompt arraignment under the six-hour rule enunciated in *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977), and modified in *Commonwealth v. Duncan*, 514 Pa. 395, 525 A.2d 1177 (1987)(plurality opinion) (the "*Davenport–Duncan* rule"). The purpose of the *Davenport–Duncan* rule is "to insure that an arrestee is not held indefinitely in a coercive custodial atmosphere without the benefit of an arraignment which provides the arrestee with a full explanation of his constitutional rights and the nature of the charges against him." *Com-*

*monwealth v. Bond*, 539 Pa. 299, 308, 652 A.2d 308, 312 (1995). In *Davenport, supra*, the Pennsylvania Supreme Court held that an arrestee must be arraigned within six hours of arrest in order "to guard against the coercive influence of custodial interrogation [and] to ensure that the rights to which an accused is entitled at preliminary arraignment are afforded without unnecessary delay." *Davenport*, 370 A.2d at 305. However, *Duncan, supra*, shifted the emphasis of *Davenport* from the time of arraignment to "when the defendant's statement was obtained, i.e., within or beyond the six-hour period." *Duncan*, 525 A.2d at 1182. Henceforth, any statement obtained within six hours of arrest, absent coercion or other illegality, is not to be suppressed on the basis of *Davenport, supra*.

¶ 16 In the present case, we reiterate the fact that appellant was not arrested when he was transported from the jail by the police. However, we find that appellant was entitled to the protections of *Duncan, supra*, and *Davenport, supra*. Not only does the *Davenport–Duncan* rule promote prompt arraignment and recognize the coercive nature of custodial police interrogations, the rule "affords protection similar to *Miranda*, in that the constitutional right not to be compelled to give evidence against oneself is served." *Commonwealth v. Goldsmith*, 422 Pa.Super. 191, 619 A.2d 311, 314–315 (1993). Since a prisoner is afforded the same Fifth Amendment protections as an arrestee who is questioned by the police, *see Mathis v. United States, supra*, we find that the principles underlying the *Davenport–Duncan* rule are applicable to prisoners who are subjected to custodial interrogations like that of appellant herein. In adjusting our focus to appellant's situation, we viewed the commencement of appellant's interrogation as the appropriate time from which to begin our analysis under the cases of *Duncan, supra*, and *Davenport, supra*. After reviewing the facts surrounding appellant's interrogation, we find

no violation of the *Davenport–Duncan* rule.

¶ 17 Appellant's confession occurred within the prescribed six hours. Appellant's interrogation began at 6:46 p.m., appellant confessed at approximately 11:40 p.m. and signed Detective McDonald's notes that memorialized his oral confession at 12:13 a.m. Although appellant was not arraigned until 3:25 a.m., the *Davenport–Duncan* rule does not exclude statements made within six hours of arrest. *See Duncan, supra*.

¶ 18 Finally, we address appellant's allegation that the trial court erred by allowing the Commonwealth to introduce evidence of appellant's willingness to take a polygraph examination. "The admissibility of evidence is a matter which lies within the discretion of the trial court, and, absent an abuse of discretion, the trial court's decision will not be disturbed." *Commonwealth v. Lester*, 554 Pa. 644, 657, 722 A.2d 997, 1003 (1998) (citation omitted). Due to the unreliable nature of polygraph tests, the results of such tests that raise inferences of guilt or innocence are inadmissible at trial. *Commonwealth v. Camm*, 443 Pa. 253, 269, 277 A.2d 325, 333 (1971). Moreover, "any reference to a [polygraph test] which raises an inference concerning the guilt or innocence of a defendant is inadmissible." *Commonwealth v. Sneeringer*, 447 Pa.Super. 241, 668 A.2d 1167, 1174 (1995)(quoting *Commonwealth v. Stanley*, 427 Pa.Super. 422, 629 A.2d 940, 942 (1993)). As a result, "we have been reluctant to permit any reference to a polygraph examination to be made before a finder of fact." *Commonwealth v. Miller*, 497 Pa. 257, 263, 439 A.2d 1167, 1170 (1982). However, the mere mention of a polygraph test does not automatically constitute reversible error. *Sneeringer*, 668 A.2d at 1174 (quoting *Stanley*, 629 A.2d at 942).

¶ 19 During a pretrial motion, defense counsel objected to allowing any reference to the polygraph test in the presence of the jury. On the first day of appellant's

trial, outside the presence of the jury, the trial judge, assistant district attorney and defense counsel further discussed how appellant's polygraph test would be treated before the jury. As stated above, appellant's interrogation began at 6:46 p.m. At 8:36 p.m., the police stopped questioning appellant in order to set up a polygraph test. Police resumed the interrogation at 11:20 p.m. Although the actual polygraph examination took fifteen minutes and was administered three times, the total time for setting up the examination and administering the examination took one hour and fifty minutes. Save for the polygraph test, appellant was not questioned during this hiatus in the interrogation. The trial judge correctly ruled that reference to the administration of the polygraph test was prohibited. Defense counsel wanted the jury to be informed that appellant continued to be questioned during the entire one hour and fifty minute span. The trial judge ruled that the jury was to be informed, without any reference to the actual administration of the polygraph exam, that appellant was questioned only for the amount of time in which the polygraph test was administered.

¶ 20 This discussion, outside of the jury's presence, continued and addressed whether any mention of the polygraph test would be permitted. The trial court ruled that mention of the polygraph would be allowed. As a result of this ruling, the Commonwealth stated the following in its opening argument:

> First thing [appellant] told Detective Rich McDonald was, I didn't have anything to do with [Mr. Washington's murder] ... [Appellant] said to [the police officers] – he stuck to that story for a long way. They talked about it, and [appellant] said, I'll even take a lie detector. That's what [appellant] said to the officer. The officer said, okay, we can work that out. And at that point [appellant] says, well, okay, I was there when he got killed. And he gives a second story.

(N.T. 9/21/98, at 27–28). On direct examination, a Commonwealth witness testified to the following:

> Commonwealth: And what did he say after telling you that is what happened? What happened next?
>
> Detective McDonald: [Appellant] continued to deny any involvement or having any knowledge concerning the death of Mr. Washington, at which point in the interview he informed me, to show that he was telling the truth, that he wished to take a polygraph test or a lie detector test. I told [appellant] that one will be made available to him, at which point he sat back in his chair and he changed his story. He told me that he was present when Mr. Washington was shot.

(N.T. 9/21/98, at 141). Detective McDonald continued to refer to the polygraph test on cross-examination as evidenced by the following testimony:

> Defense counsel: You kept repeating and he kept repeatedly denying his involvement?
>
> Detective McDonald: He denied up until the point that he offered to take a polygraph test, a lie detector test, at which point I told him one would be made available to him.
>
> Defense counsel: That was 10:36?
>
> Detective McDonald: I don't know what time that was.
>
> Defense Counsel: The time you stopped the interview?
>
> Detective McDonald: The time I stopped the interview was the time after he – once he offered to take the polygraph test, that's when he changed to his second story ...
>
> Defense Counsel: Go on. Go on. Keep going. Talk as much as you want.
>
> Detective McDonald: You asked me a question, sir.
>
> Defense Counsel: Go on. You want to continue, go on. I'm sorry.
>
> Detective McDonald: In that – 2036—

Defense Counsel: Tell me when you are done.

Detective McDonald: 2036 would be the time we stopped the interview so he would be allowed to take a lie detector test.

(N.T. 9/21/98, at 190). The Commonwealth continued such references by stating the following in its closing argument:

So [appellant] makes his choice to talk. He starts out good. He says, I wasn't even there. I didn't do anything. I was at some girl's house. That's a pretty good statement.... So now there's a horrible temptation, there's a horrible temptation when you are sitting in a room with one or two people and you know you are lying and you got to figure they know you are lying and you want them to believe you, you want them to believe what you are saying, there's a horrible temptation to just change your story a little bit.... But before [appellant] succumbed to that temptation, he tried one last thing to get them to believe him. [Appellant] said, hey, like, I'm telling you the truth, I'll even take a lie detector test. They said, okay, we can arrange for that. And I suggest to you at that point he realized they are not going for this and he made the mistake of continuing right down that path. It is human nature.

N.T. 9/21/98, at 310–311. The trial court did not instruct the jury in any manner concerning the references made to the polygraph tests.

¶ 21 Although *Camm, supra,* set forth the principle that references to polygraph tests that raise inferences of a defendant's guilt or innocence are inadmissible, this doctrine has undergone significant treatment in later cases. As stated in *Sneeringer, supra,* the mere mention of a polygraph test does not constitute reversible error. Whether a reference to a polygraph test constitutes reversible error depends upon the circumstances of each individual case and, more importantly, whether the defendant was prejudiced by such a reference. A comparison of similar cases reveals that the present case lacks important characteristics necessary to demonstrate that appellant was not prejudiced by the numerous references to the polygraph test.

¶ 22 In *Sneeringer, supra,* a Commonwealth witness testified that the defendant had refused to take a polygraph test. The defendant moved for a mistrial that was denied by the trial court. Instead, the trial court gave a cautionary instruction to the jury that explained the unreliability of polygraph tests and the impropriety of inferring any guilt from the defendant's refusal to take the polygraph test. *Sneeringer,* 668 A.2d at 1173. The defendant was not satisfied with this instruction and appealed to the Superior Court. On review, we were satisfied that the polygraph reference did not prejudice the defendant. First, we noted that the Commonwealth did not intentionally elicit the objectionable response from the witness. *Id.,* 668 A.2d at 1174. Second, the polygraph test was not administered and the witness' testimony did not reflect upon the results of the test. *Id.* Third, we found the trial court's cautionary instruction sufficient to avoid any prejudice to the defendant. *Id.*

¶ 23 Unlike *Sneeringer, supra,* the present case does not involve a single, unintentional reference to a polygraph test by a Commonwealth witness. In addition, the present case does not involve a reference to a polygraph test made in response to a question not intended to elicit such an answer. Herein, the Commonwealth directly referenced the polygraph test in its opening argument, on direct examination and in its closing argument. Moreover, no cautionary instruction was supplied to the jury by the trial court.

¶ 24 In *Commonwealth v. Rhone,* 422 Pa.Super. 521, 619 A.2d 1080 (1993), a Commonwealth witness testified that he asked the defendant whether the defendant would like to take a polygraph exam. This single utterance was the only refer-

ence made to the polygraph throughout the entire proceeding. On appeal, we determined that no prejudice resulted from the reference made to the polygraph test. *Rhone*, 619 A.2d at 1084. We agreed with the trial court that the Commonwealth's witness' error was innocent and did not raise an inference as to the guilt of the defendant. *Id.* In addition, we observed that "the trial court's striking of the remark from the record and subsequent instruction to the jury regarding stricken remarks insured that no prejudice resulted." *Id.*

¶ 25 Unlike *Rhone, supra*, the present case does not involve a single, innocent remark from a Commonwealth witness making reference to a polygraph test. Herein, the Commonwealth fully intended to and later accomplished making numerous direct references to appellant's offer to take a polygraph test and the fact that such a test was administered. In further contrast, the trial court, herein, made no attempt to avoid any prejudice like the court in *Rhone, supra*, which struck the remarks concerning the polygraph test and instructed the jury regarding stricken remarks.

¶ 26 The case of *Commonwealth v. Upchurch*, 355 Pa.Super. 425, 513 A.2d 995 (1986), involved a very remote reference to a polygraph test. The following is the testimony that the defendant complained of on appeal:

Commonwealth: Before interviewing [the defendant], what if anything did you do to assure yourself that he had been given his constitutional warnings?

Police Officer: I have a—The Polygraph Unit has a form that has to be filled out by the sub—Excuse me, the Unit has to have a form that's been—

*Upchurch*, 513 A.2d at 998 n. 2. On review, we did not find the officer's comment prejudicial. *Id.*, 513 A.2d at 998. This statement "was not prompted by the question and was elicited in testimony regarding appellant's interview and not testimony

concerning guilt or innocence." *Id.* The officer's statement offered no indication as to the results of the polygraph test or whether even a test was given. *Id.*, 513 A.2d at 998–99. "Given the form of the question and the attempt by the officer to rephrase her answer along with having it stricken by the court, we find no prejudice." *Id.*, 513 A.2d at 999.

¶ 27 As shown in the other cases, the contrasts between *Upchurch, supra*, and the present case are rather obvious. What is of particular note in the *Upchurch* case were the precautions taken by both the Commonwealth witness who attempted to rephrase her answer and the trial court which struck the objectionable testimony, even though the polygraph test was referenced in a very remote manner. This deliberate caution demonstrated by both the Commonwealth witness and the trial court underscores the perceived influence such references can have upon the fact finder and the prevailing reluctance of courts to admit any references to polygraph tests. Unlike *Upchurch, supra*, the present case contained numerous, direct references to the polygraph test and lacked any precautions by the trial court to assure the proper usage of such polygraph references by the jury.

¶ 28 The remaining cases used in our comparison are *Commonwealth v. Brinkley*, 505 Pa. 442, 480 A.2d 980 (1984), and *Commonwealth v. Miller*, 497 Pa. 257, 439 A.2d 1167 (1982). In *Brinkley*, a defense witness stated that the defendant's brother offered to take a polygraph test and that the police provided one for the defendant's brother. In *Miller, supra*, the defendant argued that the Commonwealth unfairly bolstered the credibility of one of its witnesses by referencing a polygraph test. In both cases, the Pennsylvania Supreme Court did not find that the defendant suffered prejudice and pointed to the following factors to support its conclusion: 1) the witness' reference to the polygraph test was not prompted by the question; 2) the witness' reference did not suggest the re-

sults of the polygraph; 3) the trial court issued prompt and adequate instructions regarding the unreliability and inadmissibility of polygraph tests and cautioned the jury to disregard any testimony concerning such tests. *Brinkley*, 480 A.2d at 986; *Miller*, 439 A.2d at 1171.

¶ 29 The present case lacks important characteristics deemed to avoid the suffering of prejudice by a defendant due to references of a polygraph test. First, the trial court made a pre-trial ruling that gave the Commonwealth permission to reference the polygraph test directly. This ruling ignored the reluctance expressed by our Supreme Court to permit *any* reference to polygraph tests before the fact finder. *See Miller, supra.* Furthermore, the present case lacked any safeguards to ensure the proper use of the polygraph references by the jury. The trial court never addressed the subject of polygraph tests with the jury.

¶ 30 Herein, the numerous references to the polygraph were clearly improper. These references were intentional and played a significant part in the Commonwealth's argument. Although the trial court did nothing to ensure the proper use of such references by the jury, the Commonwealth was careful not to indicate the results of this test. However, an examination of the numerous references within the context of the Commonwealth's argument demonstrates that appellant suffered prejudice.

¶ 31 Despite the trial court's pre-trial ruling that prohibited any reference to the actual administration of the polygraph test, the Commonwealth and Detective McDonald indicated to the jury that a polygraph test was indeed administered. The following testimony from the Commonwealth's opening argument indicated both appellant's willingness to take a polygraph test and the fact that a polygraph test was conducted:

They talked about it, and [appellant] said, I'll even take a lie detector. That's what [appellant] said to the officer. The officer said, okay, we can work that out. (N.T. 9/21/98, at 27–28). Later on, Detective McDonald testified that he stopped the interrogation of appellant so that appellant would be allowed to take a polygraph test. The Commonwealth repeated similar references to the polygraph test in its closing argument as well. There is no doubt that the jury knew appellant underwent a polygraph test.

¶ 32 Faced with the conclusion that appellant was given a polygraph test, the jury was provided a detailed chronology of the remainder of appellant's interrogation. The Commonwealth stated that after the police informed appellant that a polygraph test would be provided, he changed his story and told police that he was present when Mr. Washington was killed by someone else. In addition, Detective McDonald informed the jury that he halted the interrogation of appellant at 8:36 p.m. so that appellant would be allowed to take a polygraph test. Next, the jury was told that the interrogation resumed at 11:20 p.m. and appellant confessed at approximately 11:40 p.m. Thus, the jury was free to assume that appellant's confession was the result of his failing the polygraph examination.

¶ 33 Even though the Commonwealth never mentioned the results of the polygraph examination, the manner in which the Commonwealth referred to the polygraph allowed for the inference of guilt by the jury. In the absence of any safeguards to insure the proper use of the numerous references to the polygraph test by the jury, we find that appellant was prejudiced by these numerous references. The only evidence that linked appellant to the crime was his confession. The implication that appellant failed the polygraph examination clearly bolstered the validity of appellant's confession. As a result, improperly admitted evidence served to prejudice appellant. Accordingly, we reverse the judgment of sentence and remand for a new trial.

¶ 34 Reversed and remanded for a new trial consistent with the findings of this court. Jurisdiction relinquished.