J-S26035-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                              :          PENNSYLVANIA
                                                :
            v.                                       :
                                                :
                                                :
MURVIN LAMOUNT HASSEL            :
                                                :
             Appellant                       :     No. 1548 MDA 2020

Appeal from the Judgment of Sentence Entered November 17, 2020
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0006107-2018

BEFORE:  STABILE, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:            **FILED:  NOVEMBER 1, 2021**

Murvin Lamount Hassel ("Hassel") appeals from the judgment of sentence imposed following his conviction of one count each of rape and statutory sexual assault – 11 or more years older than complainant; two counts each of indecent assault – person less than 16 years of age, unlawful contact with a minor – sexual offenses, and corruption of minors ("COM") – sexual offenses; and three counts of COM.[1]  We affirm.

The instant matter involves three minor victims:  M.S., D.S., and B.L. In early 2018, when she was 15 years old, M.S. lived with her grandmother in the Willow Gardens Apartments in Highspire, Dauphin County, Pennsylvania.  N.T., 8/11/20, at 104.  M.S. knew Hassel because he lived in

---

[1] 18 Pa.C.S.A. §§ 3121(a)(1), 3122.1(b), 3123(a)(7), 6301(a)(1)(i)-(ii).

the neighborhood. *Id.* One day in May 2018, when M.S. and her friend, G.M., were outside smoking marijuana, Hassel warned M.S. that she should not smoke outside because a neighbor might call the police. *Id.* at 105-06. Hassel told M.S. that she could smoke the marijuana inside his home, and M.S. and G.M. followed Hassel inside. *Id.* Once inside, Hassel provided the girls with alcohol. *Id.* at 106-07. Hassel then "came across the couch to where [M.S. and G.M.] were sitting and he put his hands around [M.S.'s] throat, and he said he could do anything to [M.S.] now." *Id.* at 107. M.S. and G.M. left Hassel's apartment. *Id.*

D.S. testified that in 2018, when she was 13 years old, she lived in Highspire. N.T., 8/12/20, at 188-89. D.S. knew Hassel through her sister, N.S.[2] *Id.* at 189-90. D.S. went to Hassel's home in Willow Gardens during the summer of 2018 with some friends, including N.S. and B.L. *Id.* at 190. Hassel gave the minors marijuana and shots of alcohol. *Id.* at 191-93. D.S. went to Hassel's home several times over that summer. *Id.* at 194.

D.S. recalled visiting Hassel's home about a week after the first visit to buy marijuana from Hassel. *Id.* at 195-96. D.S. and her friends smoked marijuana at Hassel's home. *Id.* at 196. During that visit, D.S. returned to

---

[2] During her testimony, N.S. confirmed that she knew Hassel, because his stepdaughter was one of her friends. N.T., 8/11/20, at 167-68; *see also id.* at 169 (wherein N.S. stated that she had been to Hassel's apartment three or four times). The first time N.S. was at Hassel's house, Hassel gave her liquor. *Id.* at 170. On another occasion, N.S. was at Hassel's home with D.S. and B.L.; Hassel gave the girls liquor and marijuana. *Id.* at 171-72.

Hassel's home a third time, with B.L., because they wanted to buy marijuana. *Id.* at 198-99. Hassel offered the girls Fireball whiskey and shots of tequila. *Id.* at 199; *see also id.* (wherein D.S. described herself as "messed up," *i.e.*, intoxicated). Hassel started talking to the girls, and asked D.S. and B.L. if he could lick their toes. *Id.* at 200. D.S. said no, but Hassel proceeded to lick B.L.'s toes. *Id.* D.S. and B.L. took "a couple of more shots" and left. *Id.* at 205.

A few days later, D.S. was kicked out of her house, and went to visit a friend at Willow Gardens. *Id.* at 208-09. D.S.'s friend was not at home, and she went to Hassel's home to ask to use his phone. *Id.* at 209. D.S. and Hassel sat in Hassel's living room and talked for a few hours. *Id.* at 210-11. Hassel gave D.S. alcohol and marijuana. *Id.* at 209-10; *see also id.* (wherein D.S. indicated that she was drunk and high during that visit); *id.* at 211-12 (wherein D.S. testified that Hassel took small blue and white pills). D.S. explained that, although she had been drunk and high before that day, she felt "different." *Id.* at 213. D.S. stated, "I just -- I felt like I couldn't feel my body. Like, I was -- like, I felt heavy and I kept -- every time I went to go get up, I felt dizzy and, like, high like I was gonna fall." *Id.*

Hassel then picked up D.S., carried her to his bedroom, and placed D.S. on his bed. *Id.* at 214. Hassel took off D.S.'s clothes; D.S. tried to push him away but felt weak. *Id.* at 215-16. Hassel then removed his own clothes, placed his hand over D.S.'s mouth, and told D.S. to be quiet. *Id.* at 216.

Hassel began to touch D.S.'s breasts, and penetrated her vagina with his penis. *Id.* at 217, 220. Later, D.S. was able to get out of the bed and get dressed. *Id.* at 221. As D.S. "crawled" out of the house, she saw Hassel lying on the living room floor, asleep, with a colostomy bag beside him.[3] *Id.* at 221-22. A few days later, D.S. told N.S. and B.L. what had happened. *Id.* at 225; *see also id.* at 253-54 (wherein D.S. clarified that she "didn't tell [B.L.] the whole thing[,]" just that something had happened).

B.L. lived in Highspire with her mother in 2018. *Id.* at 268. B.L. knew M.S. and N.S. from school, and started hanging out with D.S. a couple months later. *Id.* at 270. B.L. testified that during the summer of 2018, when she was 14, she went to Hassel's house with N.S. and D.S. to buy marijuana. *Id.* at 271-72, 300. While B.L. was at Hassel's house, Hassel offered the minors alcohol. *Id.* at 273-76. The minors also smoked marijuana, which Hassel had provided to them. *Id.* at 276. Hassel touched B.L.'s inner thigh, and tried to pull her close to him. *Id.* at 278, 285. Hassel told B.L. and D.S. that he would pay for them to have sex with him. *Id.* at 285, 287. Hassel also took B.L.'s shoes and socks off, and sucked on her toes. *Id.* at 288-91. B.L. returned to D.S. and N.S.'s house that night, and went home the following day. *Id.* at 296. B.L. testified that D.S. eventually told her that "she did something with [Hassel]." *Id.* at 310.

---

[3] The parties stipulated that Hassel had a colostomy bag in 2018. N.T., 8/12/20, at 223.

On May 28, 2018, Highspire Borough Police Officer Wade Bloom ("Officer Bloom")[4] received a report from D.S.'s stepmother, Zena Carroll ("Carroll"), that D.S. had run away from home. *Id.* at 314. Officer Bloom located D.S. later that night, and returned her to her home. *Id.* at 316-17. Two days later, Officer Bloom was made aware that another part-time officer had been in contact with D.S. and Carroll; D.S. had been taken for a psychological evaluation; and there were allegations that D.S. had been sexually involved with an older man. *Id.* at 317.

Officer Bloom subsequently attended D.S.'s interview with the Children's Resource Center ("CRC"). *Id.* at 319; *see also id.* at 319-20 (wherein Officer Bloom testified that he wrote his police report based on D.S.'s CRC interview, but that his notes were not verbatim from the interview). After D.S. mentioned B.L. and M.S., Officer Bloom contacted the girls' parents, and CRC interviews were completed for them. *Id.* at 320.

As to M.S., the Commonwealth charged Hassel with one count of COM. As to D.S., the Commonwealth charged Hassel with one count each of rape, statutory sexual assault, involuntary deviate sexual intercourse – person less than 16 years of age, indecent assault – person less than 16 years of age, COM, unlawful contact with a minor (sexual offense), and COM – sexual offenses. As to B.L., the Commonwealth charged Hassel with one count each

---

[4] At that time, Officer Bloom worked full time for Middletown Borough, and part time for Highspire Borough. *See* N.T., 8/12/20, at 314.

of indecent assault – person less than 16 years of age, COM, unlawful contact with a minor (sexual offense), and COM – sexual offenses.

Relevant to this appeal, on November 22, 2019, Hassel filed a Motion to authorize funding for a polygraph examiner. Hassel argued that this is "a very serious case." Motion to Authorize Fund, 11/22/19 at 2.[5] In support, Hassel also identified an examiner who would perform an independent polygraph for $500. *Id.* at 2-3.

A jury acquitted Hassel of involuntary deviate sexual intercourse, and convicted him of all remaining charges. The trial court deferred sentencing for the preparation of a pre-sentence investigation report and completion of an evaluation by the Sexual Offender Assessment Board ("SOAB").[6] The trial court sentenced Hassel to an aggregate term of 12 to 25 years in prison, with credit for time served, followed by 5 years of probation. The trial court also imposed fines, and directed Hassel to comply with the Pennsylvania Parole Board's special conditions for sexual offenders. This timely appeal followed.

On appeal, Hassel raises the following issues for our review:

1. Whether [Hassel's] conviction for Count 1 – rape was supported by sufficient evidence[,] when the victim did not report being raped, no rape kit was conducted, in fact the same was offered but declined by the alleged victim in addition to the victim admitting she was passed out and had no clue what was going on?

---

[5] Hassel incorrectly states that he could face 40 years in prison for attempted homicide. Motion to Authorize, 11/22/19, at 2.

[6] The SOAB determined that Hassel is not a sexually violent predator.

2. Whether [Hassel's] conviction for Count 8 – indecent assault and Counts 9 and 10 for corruption of minors was based upon insufficient evidence[,] where the victim of the charges identified the wrong person as the perpetrator of said acts open [*sic*] court during trial of this matter?

3. Whether [Hassel's] conviction at Count 4 – involuntary deviate sexual intercourse was supported by legally sufficient evidence[,] where the Commonwealth failed to prove penetration – however slight?

4. Whether the [trial] court abused its discretion in denying [Hassel's] Motion for funds to conduct an independent polygraph test and instead offered to have the District Attorney's Office conduct said test?

Brief for Appellant at 6 (issues renumbered; some capitalization omitted).[7]

In his first two issues, Hassel challenges the sufficiency of the evidence

supporting his convictions of rape, indecent assault, and corruption of minors.

> The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact, while passing upon the

_____

[7] Hassel does not include any discussion of his third issue in his appellate brief, and indeed, Hassel was acquitted of involuntary deviate sexual intercourse. Thus, we will not address this claim.

credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence.

***Commonwealth v. Talbert***, 129 A.3d 536, 542-43 (Pa. Super. 2015) (citation omitted).

In his first claim, Hassel asserts that there was insufficient evidence to sustain his conviction of rape as to D.S. Brief for Appellant at 15-16. Hassel claims that D.S. provided inconsistent testimony concerning the timeline of events surrounding the alleged rape. *Id.* at 16. Hassel suggests that it was inconsistent that D.S. did not see or feel Hassel's colostomy bag during the rape, but saw it in the living room later that same night. *Id.* at 18. Additionally, Hassel claims that D.S. did not report the rape; no rape kit was conducted; and D.S. admitted that she had passed out and was unaware of what was happening during that time.[8] *Id.* at 15.

Instantly, Hassel does not specify which element or elements of rape he believes are unsupported by sufficient evidence. Rather, Hassel asserts that D.S.'s testimony was inconsistent. Such claims generally implicate the

---

[8] These bald assertions appear only in Hassel's Statement of Questions Involved and his Argument section heading. Hassel does not otherwise support these claims with reference to the record.

- 8 -

weight, rather than the sufficiency, of the evidence.[9] **See Commonwealth v. Smith**, 181 A.3d 1168, 1186 (Pa. Super. 2018). However, an appellate court may review challenges to the sufficiency of the evidence on the basis that no reliable evidence was presented to establish each element of the offense.

> Normally, the evidence is deemed to be sufficient where there is testimony offered to establish each material element of the crime charged and to prove commission of the offense by the accused beyond a reasonable doubt. The question of credibility is left to the finder of fact and the verdict will not be disturbed if the finder of fact determines the evidence is worthy of belief. We have, however, made exception to the general rule that the finder of fact is the sole arbiter of the facts where the testimony is so inherently unreliable that a verdict based upon it could amount to no more than surmise or conjecture.

**Id.** (citation, paragraph break and brackets omitted); **see also Commonwealth v. DeJesus**, 860 A.2d 102, 107 (Pa. 2004) (stating that "[q]uestions concerning inconsistent testimony … go to the credibility of the witnesses.").

The Crimes Code provides that "[a] person commits a felony of the first degree when the person engages in sexual intercourse with a complainant … [b]y forcible compulsion." 18 Pa.C.S.A. § 3121(a)(1). The Crimes Code

---

[9] To the extent that Hassel's claim implicates the weight of the evidence, we note that he failed to raise the issue with the trial court, and thus, such claim would be waived. **See** Pa.R.Crim.P. 607(A) (providing that a motion for a new trial based on a challenge to the weight of the evidence must be raised with the trial judge orally before sentencing, by written motion before sentencing, or in a post-sentence motion).

provides that "sexual intercourse," "[i]n addition to its ordinary meaning, includes per os or per anus, with some penetration however slight; emission is not required." *Id.* § 3101. Additionally, the Crimes Code defines "forcible compulsion" as "[c]ompulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied." *Id.*

> A determination of forcible compulsion rests on the totality of the circumstances, including but not limited to this list of factors: the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress. It is not mandatory to show that the victim resisted in order to prove forcible compulsion. **The victim's uncorroborated testimony is sufficient to support a rape conviction.**

*Commonwealth v. Gonzalez*, 109 A.3d 711, 721 (Pa. Super. 2015) (emphasis added; citations and paragraph break omitted).

> The trial court addressed the apparent inconsistency as follows:

> > Unfortunately, the record is unclear as to the timeline of events surrounding the alleged rape. D.S. initially testified that she had met [Hassel] during the summer of 2018. However, on cross-examination, D.S. stated that she told [Carroll] about the alleged rape on or around May 28, 2018, when D.S. was questioned by [Carroll] about an incident where D.S. allegedly stole a cell phone. Thereafter, D.S. admitted that the alleged rape had to have occurred before May 28, 2018.

Trial Court Opinion, 3/4/21, at 6-7 (citations to record omitted).

Further, the trial court set forth relevant evidence and addressed the merits of Hassel's claim:[10]

> [Officer] Bloom … responded to the residence of [] Carroll … on May 28, 2018, for a report that D.S. had run away and was concerned for her whereabouts. While [Officer] Bloom was searching for D.S., he encountered her travelling toward him on a bicycle. He stopped and detained [D.S.] to investigate a possible theft of a cell phone. D.S. was patted down, and [Officer] Bloom recovered a charging cord and a pair of headphones. The cell phone was ultimately recovered from D.S.'s vaginal area. D.S. did not disclose that she was a victim of sexual abuse at that time. However, after she was returned home, [Officer Bloom] was contacted by [] Carroll[,] who reported an allegation of sexual abuse. On July 12, 2018, D.S. was interviewed at [CRC] regarding the allegations of sexual abuse.
>
> D.S. testified that she had been kicked out of her grandmother's home, where she had been living, and first attempted to go to her friend's home[,] who lived in the same neighborhood as [Hassel]. Her friend was not home, so [D.S.] when to [Hassel's] home to use his phone because hers had been taken away. D.S. texted her sister from [Hassel's] phone and then ended up staying there to drink alcohol and smoke marijuana. In total, D.S. said that she consumed five (5) to six (6) shots of Fireball Whiskey and smoked four (4) blunts filled with marijuana.
>
> According to D.S., she and [Hassel] hung out in his living room for about two (2) or three (3) hours. While in the living room, D.S. stated that she observed [Hassel] taking small blue and white pills. D.S. denied taking any pills herself, but testified that the high she felt during that visit was different than she had felt on previous visits. While still in [Hassel's] living room, her body started to feel heavy[,] and she felt dizzy when trying to stand up.

_____

[10] The trial court focused on the element of sexual intercourse, noting that Hassel did not specify which element he wished to challenge. **See** Trial Court Opinion, 3/4/21, at 6.

Thereafter, D.S. testified that [Hassel] picked her up and carried her to his bedroom. [Hassel] placed her on his bed face up with her head towards the bottom of the bed. [Hassel] started taking her clothes off and D.S. told him "no" and tried to push him off, but was unsuccessful. [Hassel] told D.S. to keep quiet, put his hands on her mouth, and started touching her breast with his hand. D.S. tried to push his hand away, but [Hassel] grabbed both her hands and then put his penis in her vagina.

At some point, [Hassel] turned [D.S.] around so that she was in a doggy-style position. While in that position, [Hassel] grabbed her hair and put his penis inside of her vagina again. D.S. continued to say "no" and fight back, but was too weak and was unable to make [Hassel] stop. D.S. is unsure how and when [Hassel] stopped because she either blacked out or passed out[,] as she does not remember. [D.S.] was still in his bed when she awoke, but [Hassel] was not. D.S. got up, fell on the floor, put her clothes on, and eventually crawled out of [Hassel's] home. As [D.S.] went through the living room, she saw [Hassel] sleeping on the floor.

D.S. did not tell anyone about what happened at [Hassel's] home until a couple of days later when she told her sister, N.S., and B.L. [D.S.] testified that she was examined at the hospital three (3) to four (4) days later and they did not find anything. However, Mary Twomey (hereinafter "Ms. Twomey"), a nurse practitioner employed by [CRC], testified that D.S. declined an exam.

Ms. Twomey testified that in her experience, most sexual abuse victims examined do not have medical findings. Due to the length of time between the allegation and the date of the CRC interview, Ms. Twomey would not have expected medical findings even if D.S. agreed to an examination. Further, [Ms. Twomey] testified that it is widely accepted in the medical community that a diagnosis of child abuse cannot be made on medical findings alone, and are primarily based upon a detailed account of the abuse by the child. On cross-examination, D.S. was thoroughly questioned about the inconsistencies between what she stated in the interview with the CRC (which ultimately ended up in the police report) and her trial testimony.

*Id.* at 7-9 (citations to record omitted).

- 12 -

The trial court concluded that "[t]he testimony and evidence adduced at trial, together with all reasonable inferences derived therefrom, is sufficient to sustain the conviction of rape by forcible compulsion." *Id.* at 10. The trial court reiterated that D.S. was cross-examined regarding inconsistencies in her testimony, and from the verdict, "it is apparent that the jury found D.S.'s testimony to be credible." *Id.* The assessment of D.S.'s credibility was within the sole province of the jury, which was free to believe all, part or none of the evidence. *See Talbert*, *supra*; *Smith*, 181 A.3d at 1186. We cannot conclude that the verdict was based on mere conjecture, or that D.S.'s testimony was so inherently unreliable as to render the verdict unsupportable. *See Smith*, 181 A.3d at 1186. In particular, D.S.'s delay in reporting and her rejection of a rape kit were facts to be weighed by the jury, as the fact-finder, in assessing her credibility. *See id.* (stating that a sexual assault victim's delay in reporting, and the victim's return to the appellant's home following the assault, were facts to be weighed by the finder of fact). Accordingly, we will not disturb the verdict.

Hassel next challenges the sufficiency of the evidence supporting his conviction of COM relating to B.L. Brief for Appellant at 19. Hassel claims that B.L. failed to identify him as the perpetrator in the courtroom. *Id.*[11, 12]

The Crimes Code defines COM, in relevant part, as follows:

[W]hoever, being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of any crime, or who knowingly assists or encourages such minor in violating his or her parole or any order of court, commits a misdemeanor of the first degree.

18 Pa.C.S.A. § 6301(a)(1)(i).

The trial court addressed this claim as follows:

---

[11] We note that Hassel's argument concerning this claim is largely underdeveloped and includes no citation to relevant case law. *See* Pa.R.A.P. 2119(a) (providing that the argument shall include "such discussion and citation of authorities as are deemed pertinent."); *Commonwealth v. Reyes-Rodriguez*, 111 A.3d 775, 781 (Pa. Super. 2015) (stating that when an appellant cites not authority to support an argument, "this Court is inclined to believe there is none." (citing Pa.R.A.P. 2119(a) and (b)).

[12] Hassel's Statement of Questions Involved also indicates his intention to challenge his convictions at Count 8 (indecent assault) and Count 9 (COM). However, Count 9 related to D.S. rather than B.L. Further, in the Argument section of his brief, Hassel abandons any discussion of his indecent assault conviction. Accordingly, such claim is waived. *See* Pa.R.A.P. 2119(a); *Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) (stating that "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."). Hassel was charged with and convicted of COM – sexual offenses relative to B.L. at Count 14. To the extent that Hassel intended to challenge this conviction based on B.L.'s incorrect in-court identification, we would conclude that Hassel is not entitled to relief, for the reasons set forth *infra*.

B.L. did not know who [Hassel] was until the day she went to his house with D.S. and N.S. in the summer of 2018. They went to [Hassel's] home with the intention to smoke marijuana with him.

After approximately twenty (20) minutes inside, [Hassel] offered, and poured, B.L. an alcoholic beverage. That was B.L.'s first alcoholic beverage—she had never tried alcohol before. In total, B.L. drank three (3) cups of alcohol and felt very drunk. Additionally, B.L., D.S., and N.S. all smoked marijuana with [Hassel]. While in [Hassel's] living room, B.L. testified that [Hassel] grabbed her feet, took off her socks and shoes, and began sucking on her toes. This lasted approximately one (1) minute before B.L. pulled her feet back.

At some point, N.S. left[,] and B.L. and D.S. remained at [Hassel's home] because they were too drunk to leave. B.L. testified that [Hassel] offered her $500 to have sex with him, which she declined. At some point, B.L. was on [Hassel's] couch in his living room by herself and recorded a video on Snapchat while eating chips. A portion of the video was played for the jury. Although B.L. identified the wrong person as the perpetrator in the court room, she had only met [Hassel] once in 2018 and had not seen him since that date.

The testimony and evidence adduced at trial, together with all reasonable inferences derived therefrom, is sufficient to sustain the conviction of [COM]. Although B.L. did not specifically identify [Hassel] in the courtroom, a portion of the Snapchat video that she had recorded inside of [Hassel's] home was played for the jury. The Commonwealth also presented photographs of inside [Hassel's] home that were displayed for the jury. The jury had the benefit of seeing the Snapchat video, as well as the photographs of [Hassel's] home, and could reasonably conclude that the Snapchat video was recorded inside of [Hassel's] home.

Further, D.S. and N.S. both identified [Hassel] in the courtroom. B.L. testified that she was with D.S. and N.S. at [Hassel's] home. As the fact-finder, the jury was free to believe all, part, or none of the testimony presented. It is apparent that the jury believed B.L., N.S. and D.S. were together at [Hassel's] residence[,] and that D.S. and N.S. identified [Hassel] as the person who provided them alcohol and marijuana; therefore, the cumulative evidence suggests that B.L. was also in [Hassel's] home when he provided them alcohol and marijuana.

Accordingly, the evidence presented at trial, along with all reasonable inferences derived therefrom, is sufficient beyond a reasonable doubt to sustain the conviction of [COM].

Trial Court Opinion, 3/4/21, at 11-13 (citations to record omitted).

We agree with the trial court's findings, which are supported by the evidence of record, and its legal conclusions are sound. This Court has recognized that "[e]vidence of identification need not be positive and certain to sustain a conviction." *Commonwealth v. Kinney*, 157 A.3d 968, 971 (Pa. Super. 2017) (citation omitted). Although B.L. did not accurately identify Hassel in court, the additional evidence and surrounding circumstances (*i.e.*, the identifications provided by N.S. and D.S., the Snapchat video taken by B.L. inside Hassel's apartment, and photographs depicting the inside of Hassel's home) provide sufficient evidence from which the jury could infer that Hassel was the perpetrator of the offenses committed against B.L. Additionally, the jury was free to consider B.L.'s inability to correctly identify Hassel in the courtroom, and consider her credibility in this regard. *See id.* at 971-72 (stating that "unconvincing" and "vague" identifications are directed to the victim's credibility, and challenge the *weight* of the evidence). Accordingly, Hassel is not entitled to relief on this claim.

In his final claim, Hassel contends that the trial court abused its discretion by denying his Motion for funds to conduct an independent polygraph examination, and by failing to conduct a hearing on his Motion. Brief for Appellant at 20. Hassel claims that he has consistently challenged

the allegations made by the Commonwealth. *Id.* at 21. Hassel argues that

he raised the need for an independent expert, and that he properly argued his

right to have access to the same resources as non-indigent defendants. *Id.*

at 22.

This Court has stated that

[i]t is well[ ]established that indigent defendants have a right to access the same resources as non-indigent defendants in criminal proceedings. The state has an affirmative duty to furnish indigent defendants the same protections accorded those financially able to obtain them. Procedural due process guarantees that a defendant has the right to present competent evidence in his defense, and the state must ensure that an indigent defendant has fair opportunity to present his defense. However, the provision of public finds to hire experts to assist in the defense against criminal charges is a decision vested in the sound discretion of the court and a denial thereof will not be reversed absent an abuse of that discretion.

*Commonwealth v. Konias*, 136 A.3d 1014, 1019 (Pa. Super. 2016)

(citations, quotation marks, brackets and paragraph break omitted).

Additionally, "an indigent defendant does not have the right to choose his own

expert or receive funds to hire his own." *Commonwealth v. Wholaver*, 989

A.2d 883, 895 (Pa. 2010).

Further, our Court has discussed the admissibility of polygraph tests:

Due to the unreliable nature of polygraph tests, the results of such tests that raise inferences of guilt or innocence are inadmissible at trial. Moreover, any reference to a polygraph test which raises an inference concerning the guilt or innocence of a defendant is inadmissible. As a result, we have been reluctant to permit any reference to a polygraph examination to be made before a finder of fact.

*Commonwealth v. Watkins*, 750 A2d 308 (Pa. Super. 2000) (citations, quotation marks and brackets omitted).

The trial court concluded that Hassel's Motion for funding was inadequate, and aptly noted, "[Hassel's M]otion fails to state who he wished to conduct the polygraph examination on—himself or the victims." Trial Court Opinion, 3/4/21, at 13-14.

> Additionally, the [M]otion merely states that [Hassel] has identified a certified polygraph examiner to conduct a polygraph at the cost of $500 and attached their *curriculum vitae* as an exhibit. [Hassel's M]otion fails to state who[m] he wanted a polygraph examination conducted on for this [c]ourt to even begin assessing the content and relevancy of the proposed expert. This is particularly significant since polygraphs and polygraph results are inadmissible.

*Id.* at 14.

Our review confirms that Hassel's Motion contained only bald allegations. Hassel failed to identify the witnesses he hoped would complete an independent polygraph, or what evidence he hoped to obtain. In his appellate brief, Hassel states that "it was clearly intended by defense to conduct such an examination against [Hassel] himself." Brief for Appellant at 21. Thus, it appears that the intended purpose of an independent polygraph was to raise an inference concerning Hassel's innocence; as such, the polygraph test would have been inadmissible at trial. *See Watkins*, *supra*. Accordingly, the trial court did not abuse its discretion in denying Hassel's Motion for funding.

Judgment of sentence affirmed.

- 18 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/01/2021