**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Thomas ALBERT, Appellant.**

Superior Court of Pennsylvania.

Submitted Oct. 24, 2000.

Filed Jan. 4, 2001.

**550**

Adam B. Cogan, Greensburg, for appellant.

John W. Peck, Assistant District Attorney, Greensburg, for Com., appellee.

Before KELLY, MUSMANNO and ORIE MELVIN, JJ.

MUSMANNO, J.:

¶ 1 Appellant Thomas Albert ("Albert") appeals from the judgment of sentence entered against him for carrying firearms without a license, see 18 Pa.C.S.A. § 6106. We vacate the judgment of sentence.

1.  There is a notation on the Exhibit that the

¶ 2 The pertinent facts of this case are as follows. On June 30, 1998, Ronald Hopkins ("Hopkins") and Mark Santucci ("Santucci"), two police officers from Arnold, Westmoreland County, were on patrol in separate cars when they each received a radio transmission from the 911 dispatcher. The relevant portion of the broadcast reads as follows:

> Dispatcher: (Inaudible) 9 33 [referring to Santucci's vehicle.]
> Officer: 9 33
> Dispatcher: 1438 Third Avenue (inaudible) two black males on bicycles carrying guns going towards Dave's Mini–Mart.
> Officer: 10 4
> Dispatcher: 1306
> Officer: (Inaudible)
> Dispatcher: 1306
> Officer: (Inaudible) Arnold Units, the caller is reporting the two males on bicycles were chasing a vehicle. Vehicle would have been a red car with three black males and one white female inside.
> Officer: 10 4
> Dispatcher: (Inaudible) Arnold units, caller is now reporting the one individual [he] does know, his name is to be Boo. No other name is known for him.
> Officer: OK. You've got a clothing description?
> Dispatcher: Negative. Caller can't remember what they were wearing.
> Officer: (Inaudible)
> Dispatcher: 1308
> Officer: Hey that one kid up there, I know him. I don't know the other one.
> Officer: (Inaudible) 10 8.
> Dispatcher: 1308 (Inaudible) Correction 1259.
> Officer: (Inaudible) In foot pursuit, ah.
> Officer: They're south on Fourth Avenue, 1300 block.[1]

"Tape Continues" but no further transcription

¶ 3 At about 1:00 p.m., Hopkins arrived at Dave's Mini–Mart, about two minutes after he heard the radio call. N.T., 8/2/99 at 7–8. Santucci arrived at the scene at the same time, and observed a number of black people in the area. Two of these people, both males, were on bicycles. *Id.* at 8. Albert, one of the men on a bicycle, carried a bag over his shoulder. *Id.* at 8–9. The two men were not together; one was in front of Dave's Mini–Mart and one was further down the street. *Id.* at 11. Hopkins testified that it was not uncommon to see people on bicycles in that location on a summer afternoon. *Id.* at 20–21.

¶ 4 Santucci approached Albert, drew his gun, and shouted at him to stop. *Id.* at 13, 25, 38–39. Albert fled, and then discarded his bag. *Id.* at 25, 35, 40. Albert testified that he ran because he saw Santucci with his gun drawn. *Id.* at 40. A New Kensington police officer apprehended Albert, then Santucci and Hopkins handcuffed Albert and took him to the New Kensington police station. *Id.* at 29, 40. The police subsequently recovered Albert's bag and searched it, finding guns. *Id.* at 30–31.

¶ 5 Hopkins testified that he heard the radio dispatch and did not have any other information regarding Albert. *Id.* at 19. Hopkins further testified that the dispatch did not include a description of the black males, their height or weight, a description of the bicycles, a description of the gun, or any information that a crime was being committed. *Id.* at 21–22.

¶ 6 Prior to trial, Albert moved to suppress the guns seized during the warrantless search of his person and his book bag, arguing that the evidence obtained was the result of an illegal seizure.

¶ 7 At the suppression hearing, Albert testified on his own behalf, and Hopkins and Santucci testified on behalf of the Commonwealth. The suppression Motion was denied, and Albert proceeded to a non-jury trial, at which he was convicted of the above mentioned crime. The trial court sentenced Albert to one year of probation. No testimony was taken at the trial. Instead, the trial judge found Albert guilty on the basis of stipulated facts and the transcript of the suppression hearing.

¶ 8 The issue presented in this appeal is whether the pursuit of Albert by the police officers was supported by reasonable suspicion. If there was no reasonable suspicion, the guns recovered must be suppressed as the result of an unlawful seizure. For the reasons expressed herein, we conclude that the police did not have the requisite reasonable suspicion; thus, the guns found as a result of the seizure must be suppressed.[2]

¶ 9 Our court recently reiterated the appropriate standard of review on an appeal from the denial of a motion to suppress. As a reviewing court, our role is to determine:

> whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings. In making this determination, we may consider only the evidence of the prosecution's witnesses and so much of the defense as, fairly read in the context of the record as a whole, remains uncontradicted. When the factual findings of the suppression court are supported by the evidence, we may reverse only if there is an error in the legal conclusions drawn

is available. Furthermore, there is no evidence in the record interpreting the number codes in the transcription, such as 1306, 1308 and 1259.

2. We note that Albert frames the issues as 1) whether the stop by Santucci was an arrest or an investigative detention; and 2) if the stop constituted an arrest, whether the officers had probable cause to arrest Albert or, if the stop

was an investigative detention, whether it was supported by reasonable suspicion. However, under Pennsylvania law, and specifically Article I, Section 8 of the Pennsylvania Constitution, we consider the issues in terms of a seizure, rather than an arrest or investigative detention. *See Commonwealth v. Matos*, 543 Pa. 449, 672 A.2d 769 (1996).

from these factual findings. *Commonwealth v. Jackson,* 548 Pa. 484, 487, 698 A.2d 571, 572 (1997); *Commonwealth v. J.B.,* 719 A.2d 1058, 1061 (Pa.Super.1998). As a reviewing court, we are therefore not bound by the legal conclusions of the suppression court and must reverse that court's determination if the conclusions are in error or the law is misapplied.

*Commonwealth v. Hayward,* 756 A.2d 23, 26 (Pa.Super.2000).

¶ 10 Article I, section 8 of the Pennsylvania Constitution protects citizens from unreasonable searches and seizures. Our Supreme Court, in *Commonwealth v. Matos,* 543 Pa. 449, 672 A.2d 769 (1996), recently held that the Pennsylvania Constitution provides greater privacy protections than the Fourth Amendment of the United States Constitution. In *Matos,* the court held that "contraband discarded by a person fleeing a police officer are the fruits of an illegal 'seizure' where the police officer possessed neither 'probable cause' to arrest the individual nor reasonable suspicion to stop the individual and conduct a ... frisk." *Matos,* 543 Pa. at 451, 672 A.2d at 770.

¶ 11 Of course, not all encounters between the police and citizens involve seizures of persons. The test for determining whether an individual has been "seized" is, if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he or she was not free to leave. *United States v. Mendenhall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Our courts have consistently followed the *Mendenhall* test in determining whether the conduct of the police amounts to a seizure rather than a mere encounter between citizen and police officer. *See Matos,* 543 Pa. at 457, 672 A.2d at 773. The display of a weapon by an officer is an example of coercive police conduct amounting to a seizure. *Mendenhall,* 446 U.S. at 553–54, 100 S.Ct. at 1877. Here, there is no question that Albert's flight was coerced by the fact that Santucci approached him, with his gun drawn, and yelled for him to stop. No reasonable person would feel free to leave under these coercive circumstances. Thus, a seizure occurred.

¶ 12 Since we have determined that the police action in pursuing Albert was coercive, we now must determine whether that action was supported by reasonable suspicion. We conclude that the officers did not possess reasonable suspicion that Albert was currently engaged in criminal activity, and thus did not have a constitutional basis for stopping him.

¶ 13 A police officer is justified in conducting a stop of a person if the officer can point to specific facts which create a reasonable suspicion that the person is involved in criminal activity. *Commonwealth v. Hayward,* 756 A.2d 23, 27 (Pa.Super.2000); *Terry v. Ohio,* 392 U.S. 1, 25–27, 88 S.Ct. 1868, 1882–83, 20 L.Ed.2d 889 (1968). To determine whether reasonable suspicion exists, a court must examine several factors, including the informant's reliability, veracity, and basis of knowledge, as well as whether the information supplied to the police contained "specific and articulable facts" that would lead the police to believe that criminal activity may be afoot. *See Commonwealth v. Hayward,* 756 A.2d at 27 (defining reasonable suspicion in determining whether an investigatory stop was justified). Both quantity and quality of information are to be considered when assessing whether a stop is justified. *Commonwealth v. Wimbush,* 561 Pa. 368, 373, 750 A.2d 807, 810 (2000).

¶ 14 The Commonwealth offered into evidence a transcript of the call from the informant to the 911 dispatcher. The pertinent portion of the transcript of the 911 call is as follows:

Dispatcher: (Inaudible) 911.

Informant: Yes, um, can we have a, um, Arnold Police car, um, up in this area of 1438. There's, um, some dudes runnin around with guns. Um, (inaudible) shootin.

Dispatcher: (Inaudible).

Informant: Arnold. They're ridin around here on two bikes.

Dispatcher: (Inaudible) 1438. What Street?

Informant: Ah, Third Avenue. There's two individuals on bikes with guns. And they're headen [*sic*] down towards the next, ah, street, down towards Dave's, um, Mini–Mart.

Dispatcher: OK. Are, they're on bicycles or?

Informant: Yeah. There's two of them. One has a gym bag. And the other one has an afro and he's with him. (Inaudible)

Dispatcher: Black? White?

Informant: They're Black. (Inaudible)

Dispatcher: What kind of gun?

Informant: I, I don't know. (Inaudible) They were chasing (inaudible) on bikes. I don't want this shit in my neighborhood.

Dispatcher: Headed which, which way?

Informant: They're goin down towards Dave's Mini–Mart right now. I have children here. I do not want this shit in front of my house.

Dispatcher: (Inaudible) Police down. We need you to give me some more information. OK. What kind of vehicle were they chasing.

Informant: Hold on. Let me go ask my cousin. Hold on.

Dispatcher: Uh hum. (Inaudible)

Informant: It was [a] red car.

Dispatcher: Red car?

Informant: Yeah. And it was like black, and a black male was in there, black female in there.

Dispatcher: OK. Two black males?

Informant: Three black males and one female in there, in the red car.

Dispatcher: Did they have a gun could you tell?

Informant: I didn't see. I just ran off the porch.

Dispatcher: OK.

Informant: Cause I, I saw the one dude with the gym bag reachin in his bag and I was like fuck that, they gonna shoot you.

Dispatcher: What were they wearing? The people on the [ ... ]

Informant: Ah, you know what, I can't remember. One has like a, a, damn I can't even remember.

Dispatcher: OK. Did (inaudible) out of a, out of a gym bag.

Informant: No. He was reachin for something in his gym bag.

Dispatcher: OK. Did you see the, see the gun (inaudible)?

Informant: No. No I didn't. No I did not.

N.T., 8/2/99, at 5. At the conclusion of this call, the caller gave his name to the 911 dispatcher.

¶ 15 Based on the above, it is clear that the informant, although he gave his name, did not personally observe anything except two black men on bicycles. He did not observe the guns or the red car that the men were supposedly chasing (he had to ask his un-named cousin about the car), he had no description of the men, their clothing, or their bicycles, and he did not observe any criminal activity. All he saw was one man reaching into his gym bag, and that the two men were headed towards Dave's Mini–Mart. This is simply not the quantity and quality of information needed in order to establish reasonable suspicion under *Terry*.

¶ 16 The record contains no evidence that there was a red car at the scene or that the officers observed any criminal activity. Likewise, the record contains no evidence that Dave's Mini–Mart was in an area with a high incidence of criminal activity. Thus, the time and the place were not factors that could provide the officers with any reasonable suspicion. *Cf. In In-*

*terest of S.D.,* 429 Pa.Super. 576, 633 A.2d 172, 173 (1993) (holding that the time and place of the encounter, *i.e.,* an area of frequent drug selling, at 5:25 a.m., provided an independent basis for the officer to act on the informant's tip). In fact, the only detail that the officers corroborated at the scene was one black man on a bicycle (the other was further up the street) in front of Dave's Mini–Mart.

¶ 17 There is no question that if the informant in this case had been anonymous, there would not have been reasonable suspicion for the police to conduct a *Terry* stop. As the Pennsylvania Supreme Court explained in *Commonwealth v. Hawkins,*[3] 547 Pa. 652, 655, 692 A.2d 1068, 1070 (1997):

> If the police respond to an anonymous call that a particular person at a specified location is engaged in criminal activity and upon arriving at the location see a person matching the description but nothing more, they have no certain knowledge except that the caller accurately described someone at a particular location.... The fact that a suspect resembles the ... caller's description does not corroborate allegations of criminal conduct, for anyone can describe a person who is standing in a particular location.... Something more is needed to corroborate the caller's allegations of criminal conduct. The fact that the subject of the call was alleged to be carrying a gun, of course, is merely another allegation, and it supplies no reliability where there was none before. And since there is no gun exception to the *Terry* requirement for reasonable suspicion of criminal activity, in the typical anonymous caller situation, the police will need an independent basis to establish the requisite reasonable suspicion. Upon receiving unverified information that a certain person is engaged in illegal activity, the police may always ob-

serve the suspect and conduct their own investigation. If police surveillance produces a reasonable suspicion of criminal conduct, the suspect may, of course, be briefly stopped and questioned (the *Terry* investigative stop), and, if the officer has reasonable fear for his safety, police may pat down the suspect's outer garments for weapons.

*Id.*

¶ 18 This case would have been squarely governed by the rationale in *Hawkins* had the caller been anonymous. In this case, although the caller identified himself, there is a vast difference between such a caller and a caller with whom the police are familiar from past experiences. As our court recently decided in *Commonwealth v. Hayward,* 756 A.2d 23 (Pa.Super.2000):

> Clearly, if the police do not even know an informant's name, *or have never had any dealings with the informer on prior occasions,* then it cannot reasonably be said that they have any adequate basis to ascertain anything about the informant's reliability, veracity, or the accuracy of his or her tip.

*Id.* at 35.

¶ 19 In this case, the police officers relied upon a named informant that they did not know from the past and who did not personally observe any criminal activity. Neither the named informant nor the cousin claimed to have actually observed guns. Thus, the allegation that there were guns and that the two men "were shooting" is, itself, not sufficient to establish that the informant was reliable.

¶ 20 Furthermore, at the time the police officers heard the dispatch, they did not know that the informant had identified himself, or that the informant stated that the black males were shooting. This information was in the sole possession of the 911 dispatcher.

**3.** We note that *Hawkins* itself is not binding precedent, because it is a plurality opinion. However, a clear majority of the Pennsylvania

Supreme Court fully adopted the reasoning of *Hawkins* in *Commonwealth v. Jackson,* 548 Pa. 484, 698 A.2d 571 (1997).

¶ 21 However, even if the dispatch operator's knowledge was imputed to the police, there would not have been reasonable suspicion to justify a stop. In *Commonwealth v. Jackson*, 548 Pa. 484, 698 A.2d 571 (1997), the Court noted that:

> an officer responding to a police radio bulletin is justified in conducting a *Terry* stop, even if that officer is not in possession of enough facts to meet the reasonable suspicion requirement, provided the officer who requests the first officer to make the stop has the requisite facts at his or her disposal. Conversely, if the police as a whole lack sufficient information to warrant a belief that the defendant is armed and dangerous, then the search is unreasonable.

*Id.* at 490, n. 3, 698 A.2d at 573–74, n. 3 (citing *Commonwealth v. Queen*, 536 Pa. 315, 319–21 & n. 4, 639 A.2d 443, 445–46 & n. 4 (1994)). Here, the dispatcher knew that while the informant said that two people were shooting and carrying guns, the informant did not personally observe any guns. These facts make the totality of the information available to the police insufficient to provide a reasonable suspicion that Albert was engaged in criminal activity.

¶ 22 We conclude that the police did not have reasonable suspicion to stop Albert based on the informant's tip, and thus that the Motion to Suppress should have been granted.

¶ 23 Judgment of sentence vacated; jurisdiction relinquished.