## Commonwealth v. Caudell

C.P. of Lycoming County, No. CR-330-2014

BUTTS, *J.*, Sept. 16, 2014—On April 23, 2014, the Defendant filed a timely Omnibus Pretrial Motion. A hearing on the motion was held on June 23, 2014.

## I. Background

On February 23, 2014, the Lycoming County 911 Communications Center received a complaint that a juvenile pointed a gun at another and then went into the residence at 610 Penn Street, Williamsport, Pennsylvania. At 3:52 P.M., the Communications Center notified police of an incident involving a gun at 610 Penn Street. During the hearing on the Omnibus Pretrial Motion, Officer Joshua Bell of the Williamsport Bureau of Police testified that upon notification of the complaint, he and one or two other officers proceeded to 610 Penn Street, while another group of officers proceeded to the complainant's location, which was also on Penn Street. While en route to 610 Penn Street, Bell was notified that the juvenile who allegedly pointed the gun was wearing an orange shirt and had cornrows. Bell testified that he arrived at 610 Penn Street between three and seven minutes after police were notified of the compliant. According to Communications Center's call log, Bell arrived at 610 Penn Street at 3:55 P.M. Bell testified that the complainant was the person at whom the juvenile pointed the gun, but he also testified that he did not talk with the complainant and did not know whether the complainant was reliable.

Upon arriving at 610 Penn Street, Bell went to the residence's door, which was opened by a juvenile with an orange shirt and cornrows. Officers detained the juvenile on the porch of the residence. No gun was discovered on the juvenile. Eugene Caudell (defendant), who is the juvenile's father, then came to the door. He was also removed from the residence and detained.

Bell testified that officers then went through the residence to look "for anybody else that might be in the residence." Bell testified that the officers did this to make sure that "no one else was in there when officers are in there." While going through the residence, officers noticed a strong odor of marijuana and several items of drug paraphernalia. They did not find anyone else in the residence. The officers exited the residence and applied for a warrant to search the residence for controlled substances and drug paraphernalia.

Although it is unclear exactly when, the juvenile told the officers that a gun was inside the residence in an entertainment center. On direct examination, Bell testified that he asked the juvenile about a gun before the officers entered the residence. On cross examination, Bell testified that he could not remember whether he asked about a gun before or after entering the residence. The juvenile testified that police asked him about a gun after they entered the residence. The juvenile also testified that he told the officers that the gun was a BB gun.

At 5:35 P.M., Magisterial District Judge Gary Whiteman (Whiteman) issued a warrant to search 610 Penn Street for controlled substances and drug paraphernalia. At

6:04 P.M., the officers executed the warrant. They found marijuana, drug paraphernalia, Ziploc bags, and an envelope containing cash and checks together totaling $409.75. A BB gun was found in an entertainment center.

The defendant was charged with Possession of Marijuana with intent to deliver.[1] In his Omnibus Pretrial Motion, the defendant argues that the evidence is insufficient to establish a prima facie case on the element of "intent to deliver." The defendant also argues that the officers' initial entry into 610 Penn Street and the search pursuant to the warrant violated the defendant's rights under the fourth amendment to the United States Constitution and article I, Section 8 of the Pennsylvania Constitution. Specifically, the defendant argues that the initial entry was improper since the officers did not have a reasonable belief that there were occupants of the residence who posed a danger to the officers or others. The defendant argues that since the officers' observations in the initial entry led to the warrant, the search pursuant to the warrant was also done in violation of the defendant's constitutional rights. The defendant asks this court to exclude the evidence obtained during the initial entry and the search pursuant to the warrant since it was obtained in violation of the defendant's rights.

During the hearing on the defendant's omnibus pretrial motion, the Commonwealth argued that the initial entry did not violate the defendant's rights because the officers did indeed have a reasonable belief that the residence

---

1. Possession of Marijuana with intent to deliver is defined in 35 P.S. § 780-113(a)(30). It is a felony. 35 P.S. § 780-113 (f)(2).

harbored an individual who posed a danger to the officers or others. The Commonwealth argued that this reasonable belief came from the facts that a gun was used by a suspect who entered a family residence that may have contained other people. Finally, the Commonwealth argued that even if the initial entry violated the defendant's rights, the evidence obtained during the search pursuant to the warrant would have been inevitably discovered by police; therefore, the evidence should not be excluded.

## II. Discussion

### A. The Exigent Circumstances Exception to the Fourth Amendment Warrant Requirement

"The United States Supreme Court has recognized that there are 'exigent circumstances' which justify a warrantless search incident to an arrest." *Commonwealth v. Curry*, 494 A.2d 1146, 1148 (Pa. Super. 1985). "Absent probable cause and exigent circumstances, the entry of a home without a warrant is prohibited under the fourth amendment." *Commonwealth v. Roland*, 637 A.2d 269, 270 (Pa. Super. 1994) (citing *Payton v. New York*, 445 U.S. 573, 583-90 (1980)). Among the factors to be considered [in determining the existence of exigent circumstances] are:

> (1) the gravity of the offense, (2) whether the suspect is reasonably believed to be armed, (3) whether there is above and beyond a clear showing of probable cause, (4) whether there is strong reason to believe that the suspect is within the premises being entered, (5) whether there is a likelihood that the suspect will escape

if not swiftly apprehended, (6) whether the entry was peaceable, and (7) the time of the entry, i.e., whether it was made at night.

*Commonwealth v. Wagner,* 406 A.2d 1026, 1031 (Pa. Super. 1979). "Other factors may also be taken into account, such as whether there is hot pursuit of a fleeing felon, a likelihood that evidence will be destroyed if police take the time to obtain a warrant, or a danger to police or other persons inside or outside the dwelling." *Roland,* 637 A.2d at 271.

The exigencies of police during an arrest in a confined area give rise to a protective sweep. A protective sweep is "a quick and limited search incident to an arrest and conducted to protect the safety of police officers or others; it is narrowly confined to a cursory visual inspection of those places in which a person may be hiding." *Commonwealth v. Crouse,* 729 A.2d 588, 592 (Pa. Super. 1999). In *Maryland v. Buie,*[2] the Supreme Court of the United States wrote the following:

There is an...interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter.... A protective sweep...occurs as an adjunct to the serious step of taking a person into custody for

2. 494 U.S. 325 (1990)

the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.

494 U.S. at 333.

The Supreme Court held that "the fourth amendment would permit [a] protective sweep undertaken...if the searching officer 'possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing,' that the area swept harbored an individual posing a danger to the officer or others." 494 U.S. at 327 (quoting *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983)).

In *Commonwealth v. Crouse*,[3] the Superior Court of Pennsylvania adopted the *Buie* test for determining whether a protective sweep is constitutional under article I, section 8 of the Pennsylvania Constitution. 729 A.2d at 597.

B. Cases Dealing with Exigent Circumstances

In *Commonwealth v. Curry*,[4] police officers responded to a reported robbery and shooting incident. 494 A.2d at 1146. At the scene, police talked with an eyewitness, who directed them to the defendant's apartment. *Id.* at 1147. Police arrived at the defendant's apartment, and

---

3. 729 A.2d 588 (Pa. Super. 1999).
4. 494 A.2d 1146 (Pa. Super. 1985).

through a screen door, saw the defendant inside. *Id.* They noticed that the defendant was sweating and had blood spatter on his shirt. *Id.* Police asked the defendant to step out onto the porch, and when he did, the eyewitness identified him as the assailant in the robbery and shooting. *Id.* Police arrested the defendant on the porch and then checked the apartment to make sure nobody was in it. *Id.* While checking the apartment, police saw a handgun in plain view. *Id.* The Superior Court of Pennsylvania held that "the particular circumstances of th[e] case justified the police activities in undertaking to secure defendant's apartment incident to the arrest." *Id.* at 1151. The court wrote the following:

> [Police] had no way of knowing whether or not anyone else was in the apartment. More importantly, police knew that a shooting incident had just occurred, an eyewitness identified defendant as the assailant, defendant was observed to be sweaty and his shirt was blood-spattered, and *the gun used in the shooting incident was not yet accounted for* when they arrested defendant on his porch. Under these circumstances, it was not unreasonable for police to enter the apartment and make a brief security check to ensure that no one remained inside the apartment who might use the as yet unaccounted for weapon. Such conduct is perfectly consistent with the rationale underlying the exigent circumstances doctrine, namely: the need to ensure the safety of police officers. In an emergency situation such as this, the potential threat of the unknown can be more dangerous than the threat of the known. We think it is unreasonable to ask police officers arriving at the scene

of a shooting incident and arresting defendant on his porch, to assume that nobody else was in defendant's apartment.

*Id.* at 1150.

The court also wrote:

It would be stretching the boundaries of logic to hold that the need to ensure the safety of an arresting officer (and, in this case, the people who had gathered near the apartment) is not as great when he arrests a suspect on his porch, in front of the screen door, as when he arrests a suspect *inside* the apartment, just on the other side of the screen door. Furthermore, it is clear from the facts of this case that police could have legally arrested defendant inside of his apartment. A crime of violence had been committed; it was reasonable to assume that the suspect had a gun; police had probable cause to arrest; and they had a strong reason to believe that the suspect was on the premises.

*Id.* at 1151.

In *Commonwealth v. Norris*,[5] a rape victim received a phone call from the rapist, who threatened the victim with more harm if she reported the rape. 446 A.2d at 248. The threats implicated the brother of the rapist. *Id.* at 249. Police were then notified, and during an interview, the victim said that she had been threatened with a gun and taken at knifepoint to an apartment. *Id.* at 248 and 252. The victim described the apartment building and

---

5. 446 A.2d 246 (Pa. 1982).

told police the number of the apartment to which she was taken. *Id.* at 248.

After arriving at an apartment building that matched the description given by the victim, police went to the apartment with the number that the victim told them. *Id.* A women across the hall from the apartment told police that a person fitting the description of the rapist lived with his brother in the apartment. *Id.* at 248 and 252.

Police entered the apartment and arrested the defendant. *Id.* at 252. After arresting the defendant, police entered a bedroom and saw a knife in plain view. *Id.* at 249-50. The Supreme Court of Pennsylvania held that the trial court properly allowed the knife to be introduced into evidence because the police were justified in going into the bedroom. *Id.* at 250. The court wrote:

> [T]he police had every reason to believe a firearm was available to the occupants of the apartment and that one of its usual occupants, [defendant's] brother, whom defendant had implicated in his threats of harm to the victim, was unaccounted for in the living room. To expect these officers to turn their backs on the bedrooms is to expect too much. They therefore had a right to enter the bedroom to insure their safety from that quarter.

*Id.* at 249.

In *Commonwealth v. Taylor*,[6] police conducted a three-week surveillance of a convenience store that they

6. 771 A.2d 1261 (Pa. 2001).

believed was being used to sell narcotics. 771 A.2d at 1264. During the surveillance, police had an informant make a controlled buy in the store. *Id.* Police then obtained a warrant to search the store for narcotics. *Id.* Shortly before executing the warrant, police observed the defendant and another individual go into store. *Id.* at 1268. During the search, police found a large amount of a controlled substance but did not see the defendant or the other individual in the store. *Id.* Police then went into the store's basement, where they saw the defendant and the other individual. *Id.* They searched the defendant and found a controlled substance in his pocket. *Id.* at 1264.

The Supreme Court of Pennsylvania held that the police had conducted a constitutional protective sweep when they went into the store's basement. *Id.* at 1267-68. The court wrote:

> [T]here are specific and articulable facts, which "when taken together with the rational inferences from those facts," would give the police reasonable concerns for their safety. Here, after extensive surveillance and probable cause of unlawful activity, the police entered a building to search for narcotics. Once inside the convenience store, the police apprehended [a person] and located a large quantity of a controlled substance but could not confirm the whereabouts of two individuals who had just entered. As the only accessible area adjoining the first floor, the basement provided a logical hiding place for [the two individuals]. The police entered the basement under a reasonable belief that third parties were present and could pose a threat to

them, therefore exigent circumstances legally justified the protective sweep of the basement.

*Id.* at 1268.

In *Commonwealth v. Webb*,[7] the defendant's family reported that the defendant had left a residence after he made threats and displayed a gun. No. 00-10212 at 1. The family told police that the defendant was going to his residence and was with his sister. *Id.*

When a police officer arrived at the defendant's residence, he saw the defendant's sister outside. *Id.* The sister was detained for investigatory purposes. *Id.* The officer then made contact with the defendant, who was inside the residence. *Id.* at 2. Abiding by the officer's request, the defendant came out of the residence. *Id.* He was then arrested. *Id.* A search of the defendant did not yield a gun. *Id.*

The officer then entered the defendant's residence for safety reasons. *Id.* While in the residence, the officer saw drug paraphernalia in plain view. *Id.* The officer then applied for and obtained a warrant to search the residence for drug paraphernalia. *Id.* at 2-3. Drug paraphernalia and a BB gun were found during the search. *Id.* at 3.

The Honorable Kenneth Brown of the Court of Common Pleas of Lycoming County suppressed the evidence obtained from the entry and the evidence obtained from the search. *Id.* at 5-6. The court wrote, "There was no immediate exigency confronting the officer which would

---

7. No. 00-10212 (Brown, J., Oct. 17, 2000).

have vitiated the search warrant requirement." *Id.* at 5.

## C. Law of Police Interaction with Citizens

The above cases show that in order to enter a home because of exigent circumstances, police must have probable cause to make an arrest.[8] "Whether [an] arrest was constitutionally valid depends...upon whether, at the moment the arrest was made, the officers had probable cause to make it — whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

A court must take into account the "totality of the circumstances" when determining whether an officer had probable cause. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).

"In order to arrest without a warrant, the officer must have a reasonable belief in the probability of criminal activity by the person to be arrested. However, that belief

---

8. In *Roland*, the court wrote, "absent *probable cause* and exigent circumstances, the entry of a home without a warrant is prohibited under the fourth amendment." 637 A.2d at 270 (emphasis added). In *Buie*, the Court wrote, "A protective sweep . . . occurs *as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime.* 494 U.S. at 333 (emphasis added). In *Crouse*, the court defined a protective sweep as "a quick and limited search *incident to an arrest.*" 729 A.2d at 592 (emphasis added). In *Curry*, the court noted that police had probable cause and could have legally arrested the defendant inside the apartment. 494 A.2d at 1151. In *Norris*, police conducted an interview with the victim in order to obtain information before they arrested the defendant. 446 A.2d at 248. In *Taylor*, police conducted a three-week surveillance and used an informant. 771 A.2d at 1264.

need not be grounded in the officer's direct, personal knowledge of the relevant facts and circumstances. It may, instead, rest solely on information supplied by another person where there is a 'substantial basis' for crediting that information." *Commonwealth v. Stokes*, 389 A.2d 74, 76 (Pa. 1978). "[A]n informant's 'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value of his report." *Gates*, 462 U.S. at 230. "[Supreme Court] decisions applying the totality-of-the-circumstances analysis...have consistently recognized the value of corroboration of details of an informant's tip by independent police work.... [I]n making a warrantless arrest an officer 'may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.'" *Id.* at 241-242 (quoting *Jones v. United States*, 362 U.S. 257, 269 (1960)).

If one police officer has probable cause to arrest a person, other police officers can arrest that person "even though they [are] unaware of the specific facts that established probable cause." *United States v. Hensley*, 469 U.S. 221, 230-31 (1985); *see also Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971).

"[T]he statement of a victim, identifying the perpetrator of a crime, has been found sufficient to establish probable cause for that person's arrest." *Stokes*, 389 A.2d at 77. In *Commonwealth v. Hall*,[9] a woman provided police with detailed description of her assailant. 317 A.2d at 892.

---

9. 317 A.2d 891 (Pa. 1974).

Approximately three months after the assault, the woman saw the defendant in a police car. *Id.* at 893. The woman immediately recognized the defendant as her assailant, "but was unable to speak when questioned [by police] because she became frightened and shocked at seeing her attacker again." *Id.* The Supreme Court of Pennsylvania held that police had probable cause to arrest the defendant after seeing the woman's reaction. *Id.* at 894. The court wrote the following:

> The victim's immediate reaction, even though she made no *verbal* communication, was a sufficient communication from which reasonable police officers could conclude that the appellant was not a stranger but was the man who had attacked her. The police were observing the victim's reactions when she first saw the appellant and saw that the victim had lost control of herself. Nothing occurred that would explain her reactions except an inferred recognition of her attacker. We cannot say that at that point the police did not have probable cause to detain the appellant.

*Id.*

"A detailed citizen's report of a specific crime in progress is appropriately addressed by a prompt investigatory stop; general information to police about a person who has broken the law in the past is not." *Commonwealth v. Collazo*, 692 A.2d 1116, 1119 (Pa. Super. 1997). Just because an officer can make an investigatory stop does not mean that the officer has probable cause to arrest.[10] "The reasonable

10. "It is well settled that there are three distinct levels of interaction between law enforcement and the general public. The first level is the

suspicion necessary to justify a[n] [investigatory] stop is less stringent than probable cause...." *In the Interest of S.D.*, 633 A.2d 172, 174 (Pa. Super. 1993).

In *Adams v. Williams*,[11] an informant had a history of supplying a certain police officer with tips. 407 U.S. at 146. On a specific occasion, the informant notified the officer that the defendant had a gun at his waist and was carrying narcotics. *Id.* at 144-45. The officer investigated the tip and removed a gun from the defendant's waistband. *Id.* at 145. The Supreme Court held that the informant's tip "carried enough indicia of reliability to justify the officer's forcible stop of [the defendant]." *Id.* at 147. The court wrote the following:

> The informant was known to [the officer] personally and had provided him with information in the past. This is a stronger case than obtains in the case of an anonymous telephone tip. The informant here came forward personally to give information that was immediately verifiable at the scene.

*Id.* at 146. The court noted that the informant's tip "may have been insufficient for a narcotics arrest." *Id.* at 147.

"When...the underlying source of the police department's information is an anonymous telephone call,

mere encounter, which need not be supported by any level of suspicion, but it carries no official compulsion to stop or respond. The second level is the investigative detention, which must be supported by reasonable suspicion; it subjects a suspect to a stop and period of detention, but it does not involve such coercive conditions as to constitute the functional equivalent of arrest. Finally, the third level is an arrest or custodial detention, which must be supported by probable cause." *Commonwealth v. Daniels*, 999 A.2d 590, 596-97 (Pa. Super. 2010) (citations omitted).
11. 407 U.S. 143 (1972).

the courts have recognized that the tip should be treated with particular suspicion." *Commonwealth v. Jackson*, 698 A.2d 571, 573 (Pa. 1997). A tip from a known informant can be treated as more reliable than a tip from an unknown informant, because "the known informant places himself or herself at risk of prosecution for filing a false claim if the tip is untrue, whereas an unknown informant faces no such risk." *Id.* at 574. However, "there is a vast difference between [a caller who gives police his or her name] and a caller with whom the police are familiar from past experiences." *Commonwealth v. Albert*, 767 A.2d 549, 554 (Pa. Super. 2001). In Albert, the police received information from "a named informant that they did not know from the past and who did not personally observe any criminal activity." *Id.* Relying on this information, an officer stopped the defendant. *Id.* at 551. The Superior Court of Pennsylvania held that the police did not have reasonable suspicion to stop the defendant. *Id.* at 555. The court quoted the following sentence from *Commonwealth v. Hayward*:[12]

> [I]f the police do not even know an informant's name, *or have never had any dealings with the informer on prior occasions*, then it cannot reasonably be said that they have any adequate basis to ascertain anything about the informant's reliability, veracity, or the accuracy of his or her tip.

*Id.* at 554.

D. The Commonwealth has not Shown that Police had

---

12. 756 A.2d 23, 35 (Pa. Super. 2000).

Probable Cause to Arrest a Person at 610 Penn Street.

Under Pennsylvania Rule of Criminal Procedure 581(H), the Commonwealth has the burden of proving by a preponderance of the evidence that challenged evidence was not obtained in violation a defendant's rights. *See* comment to Pa. R. Crim. P. 581. After reviewing the circumstances of the entry into 610 Penn Street, this court finds that the Commonwealth has not met its burden. As mentioned above, probable cause can be established through a victim's statements, but police must necessarily determine that there is in fact a victim of a crime. While in some situations, police can almost instantaneously determine that a person is a victim, when there is no physical evidence, statements of witnesses and the person who claims to be a victim are particularly important in determining whether a crime has occurred. The officers who went to 610 Penn Street did not talk with the complainant or any witnesses. They could have acted on the information possessed by the officers at the complainant's location, but the Commonwealth did not present the testimony of any of the officers who went to the complainant. This court will not speculate on what was known to the officers who went to the complainant. It is left with only the testimony of Officer Bell.

Bell testified that the complainant was the person at whom a gun was pointed, but Bell could not have made this determination before he entered 610 Penn Street because he did not talk with the complainant or witnesses. At the time of entry, Bell knew only that a person inside 610 Penn Street with an orange shirt and cornrows had been

*accused* by a named person of pointing a gun at another. The Commonwealth presented no evidence that Bell knew the complainant's reliability or even the complainant's name. In fact, Bell testified that he did not know whether the complainant was reliable. As Bell did not talk with the complainant or witnesses, he could corroborate only that a juvenile with an orange shirt and cornrows was inside 610 Penn Street. Such knowledge was not sufficient to warrant a belief that a person inside 610 Penn Street had committed a crime.

If Bell had the reasonable suspicion needed to detain the juvenile for investigatory purposes, information obtained from questioning the juvenile could contribute to the establishment of probable cause. This court, however, does not need to decide if Bell had the requisite reasonable suspicion because it is unclear what Bell discovered between the time he detained the juvenile and the time of entry into the residence. On direct examination, Bell testified that before entering the residence, he asked the juvenile about a gun, and the juvenile responded that a gun was inside an entertainment center in the residence. On cross examination, however, Bell testified that he did not remember whether he asked the juvenile about a gun before or after officers entered the residence. In addition, the juvenile testified that he told the officers about a gun in an entertainment center after they went through the residence. The juvenile also testified that he told the officers that the gun was a BB gun. Because of Bell's uncertain testimony, this court cannot credit Bell with having the knowledge of a gun inside the residence before he entered. Even if Bell knew a gun was in the residence,

he still did not have probable cause to arrest the juvenile. As Bell did not talk with the complainant or witnesses, he still could not corroborate that the juvenile had pointed a gun at anybody.

E. Police Entry into the Residence at 610 Penn Street was Unlawful.

Because the police did not have probable cause to arrest anyone at 610 Penn Street, their entry into the residence violated the defendant's constitutional rights.

F. Evidence Acquired as a Result of an Unlawful Search Must be Excluded Unless the Evidence Would have Been Inevitably Discovered.

In *Murray v. United States*,[13] Justice Scalia discussed what evidence should be excluded from trial:

> The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search and of testimony concerning knowledge acquired during an unlawful search. Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint."

487 U.S. at 536-37 (citations omitted).

---

13. 487 U.S. 533 (1988).

As alluded to in Justice Scalia's discussion, "evidence that has been illegally obtained need not always be suppressed." *Nix v. Williams*, 467 U.S. 431, 441 (1984). "[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred.... When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." *Nix v. Williams*, 467 U.S. 431, 443 (1984). "So long as a later, lawful seizure is genuinely independent of an earlier, tainted one...there is no reason why the independent source doctrine should not apply."[14] *Murray*, 487 U.S. at 542.

"The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Murray v. United States*, 487

---

14. Because of the emphasis on the importance of privacy in Pennsylvania jurisprudence, Pennsylvania's independent source doctrine is more limited than the federal independent source doctrine. *See Commonwealth v. Melendez*, 676 A.2d 226, 231 (Pa. 1996). "Application of the 'independent source doctrine' is proper only in the very limited circumstances where the 'independent source' is truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered." *Id.* at 231 (quoting *Commonwealth v. Mason*, 637 A.2d 251, 257-58 (Pa. 1993) (Cappy, J., dissenting)). The Supreme Court of Pennsylvania eased the independent police team requirement in *Commonwealth v. Henderson*, 47 A.3d 797, 805 (Pa. 2012).

U.S. 533, 539 (1988). When dealing with the inevitable discovery doctrine, "[t]he ultimate question...is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence..." *Murray v. United States*, 487 U.S. 533, 542 (1988). A search is not a genuinely independent source of information and evidence "if the [officers'] decision to seek the warrant was prompted by what they had seen during the initial [unlawful] entry, or if information obtained during that entry was presented to the magistrate and affected his decision to issue the warrant." *Murray*, 487 U.S. at 542.

G. The Evidence Obtained from the Residence at 610 Penn Street Should be Excluded as it Would not Have Been Inevitably Discovered.

The officers obtained a warrant to search 610 Penn Street for controlled substances and drug paraphernalia. The decision to seek the warrant was prompted by the officers seeing several items of drug paraphernalia and smelling the strong odor of marijuana during the unlawful entry into 610 Penn Street. These observations were presented to MDJ Whiteman and likely affected MDJ Whiteman's decision to issue the warrant as there was no other mention of drugs or drug paraphernalia in 610 Penn Street in the affidavit of probable cause. Therefore, the search pursuant to the warrant was not a genuinely independent search. As with any evidence obtained during the unlawful entry, any evidence obtained during the search pursuant to the warrant should be excluded.

## III. Conclusion

In order to enter a home because of exigent circumstances, police must have probable cause to make an arrest. Here, the Commonwealth has not shown that police had probable cause to arrest anyone at 610 Penn Street. Therefore, the officers' initial entry into 610 Penn Street violated the defendant's constitutional rights. Any evidence obtained during the unlawful entry should be excluded from evidence. In addition, any evidence obtained during the subsequent search pursuant to the warrant should be excluded from evidence.

## ORDER

And now, this 16th day of September, 2014, based on the foregoing opinion, the defendant's motion to suppress evidence is hereby granted. It is ordered and directed that any evidence obtained during the officers' initial entry into the residence and any evidence obtained during the search pursuant to the warrant be suppressed.