J-S22044-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellant :
:
:
:
v. :
:
:
:
LEWIS BALDWIN : No. 2133 EDA 2021

Appeal from the Order Entered September 23, 2021
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003564-2020

BEFORE: BOWES, J., McCAFFERY, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED DECEMBER 12, 2022**

The Commonwealth of Pennsylvania appeals from the order granting the motion filed by Lewis Baldwin ("Baldwin") to reconsider the order denying his motion to suppress evidence. We reverse and remand.

The trial court summarized the relevant factual history as follows.

> On July 17, 2020 at 11:33 p[.]m[.], Officer Vincent Manzo and his partner responded to a radio call describing a shooting involving a black male discharging one round into the ceiling of 4603 Germantown Avenue. Upon arriving at 4603 Germantown Avenue[,] Officer Manzo spoke with a resident, Barbra Brisco. Ms. Brisco told the responding officers that . . . Baldwin . . . discharged a firearm once into the ceiling of the front room of the residence and fled southbound on Germantown Avenue. Ms. Brisco described [Baldwin] as a 5'8["] black male with a dark complexion, wearing a red shirt, plaid shorts, black socks, and bedroom slippers. She stated [Baldwin] had a black revolver in his waistband. Ms. Brisco told Officer Manzo [Baldwin's] name and that he frequents a [beer] deli near the intersection of 20th Street and Windrim Avenue. Officer Manzo observed one bullet hole in the ceiling of the front room. Approximately three to five minutes after arriving at the residence[,] Officer Manzo relayed a flash

description of [Baldwin] over police radio. N.T.[,] 8/9/2021[,] at 6-8, 10.

At 11:52 p[.]m[.], Officer Gregory Kovacs and his partner, Officer Braun, while on routine patrol . . . responded to the flash description relayed over police radio. Officer Kovacs testified that he and his partner encountered [Baldwin] at 4500 North 20th Street, about one-half mile from 4603 Germantown Avenue, in the approximate area of the beer deli near 20th and Windrim Avenue. *Id*. at 16, 27.

Fully uniformed, in a marked patrol car, Officer Kovacs activated his body worn camera and exited the car. Officer Kovacs testified that he told [Baldwin] to stop. [Baldwin] ignored Officer Kovacs[,] who then repeated the command to stop. [Baldwin] then removed a small black revolver from his waistband and placed it on the sidewalk. Officer Kovacs, with his service weapon drawn, ordered [Baldwin] to lay on the sidewalk face down. [Baldwin] complied, and Officer Kovacs placed him in handcuffs. Officer Kovacs recovered the firearm removed by [Baldwin] and recorded it on a property receipt. *Id*. at 22-30.

Trial Court Opinion, 12/10/21, at unnumbered 1-2 (footnotes and unnecessary capitalization omitted).

Police charged Baldwin with numerous firearm offenses, as well as terroristic threats, simple assault, and recklessly endangering another person ("REAP"). Baldwin filed an omnibus pretrial motion to suppress evidence of the firearm in which he checked boxes to indicate that the bases for suppression were that he was: (1) subjected to a stop and frisk without reasonable suspicion; (2) arrested without probable cause; and (3) arrested without a lawfully issued warrant. The court conducted a suppression hearing at which Officers Manzo and Kovacs testified. Baldwin presented no evidence at the suppression hearing. Following a discussion with the suppression court,

the district attorney agreed that an arrest occurred "when [the officers] were approaching [Baldwin] out of the [police] car with the guns drawn." N.T., 8/9/21, at 43.[1] However, the Commonwealth argued that, based on the detailed and specific nature of the flash description, the officers had probable cause to arrest Baldwin.[2] The court agreed that the officers had probable cause to arrest Baldwin and, on this basis, denied suppression.

Baldwin filed a motion for reconsideration in which he raised an alternative argument that the firearm should be suppressed based on the

_____

[1] Officer Kovacs testified that his weapon was "drawn" when he ordered Baldwin to stop. N.T., 8/9/21, at 30. However, Officer Kovacs provided no testimony as to when he first drew his weapon or whether his gun was ever pointed at Baldwin. Nor did Officer Kovacs provide any testimony as to whether Officer Braun's weapon was drawn at any point during the encounter. Although the video from Officer Kovacs body camera was played during the suppression hearing, it was not marked as an exhibit and neither party moved for its admission into evidence. Thus, as the video is not part of the certified suppression record, we may not consider it. *See Commonwealth v. Neal*, 151 A.3d 1068, 1070-71 (Pa. Super. 2016) (holding that the scope of review from a suppression ruling is limited to the evidentiary record created at the suppression hearing). Accordingly, there is no evidence in the certified suppression record that Officer Braun's weapon was ever drawn or that Officer Kovacs emerged from the police car with his weapon drawn.

[2] At the suppression hearing, Baldwin's counsel argued that the firearm was abandoned by Baldwin as a result of an illegal seizure which violated the principles articulated in *Commonwealth v. Matos*, 672 A.2d 769, 771 (Pa. 1996) (holding that if the pursuit of a suspect by police constitutes a seizure, then the abandonment by the suspect of contraband is considered coerced and the officer must demonstrate either probable cause to make the seizure or a reasonable suspicion to stop and frisk).

officers' violation of Pa.R.Crim.P. 502.[3]  Specifically, Baldwin argued that because his conduct in discharging a firearm into a ceiling constituted, at most, a misdemeanor offense of REAP[4] which was committed outside the presence of police, Rule 502 required the officers to have probable cause and specific statutory authorization to arrest him.  The trial court conducted a hearing on the motion for reconsideration.  The Commonwealth argued that Baldwin did not discard his firearm as a result of a Rule 502 violation because merely an investigative detention, rather than an arrest, occurred at the time Baldwin was ordered to stop.[5]  At the conclusion of the hearing, the trial court granted reconsideration and ruled that the firearm was suppressed based on a violation of Rule 502.  The Commonwealth filed a timely notice of appeal

---

[3] Rule 502 provides that "[c]riminal proceedings in court cases shall be instituted by: . . . (2) an arrest without a warrant: . . . (c) upon probable cause when the offense is a misdemeanor not committed in the presence of the police officer making the arrest, when such arrest without a warrant is specifically authorized by statute."  Pa.R.Crim.P. 502(2)(c); **see also id**. Cmt. (explaining that "[p]aragraph (2)(c) is intended to acknowledge those specific instances wherein the General Assembly has provided by statute for arrest without a warrant for a misdemeanor not committed in the presence of the arresting officer").

[4] **See** 18 Pa.C.S.A. § 2705.

[5] The Commonwealth additionally argued that Baldwin's Rule 502 argument was waived because he did not raise it at the suppression hearing.  The trial court disagreed, noting that Baldwin's counsel asserted that a basis for suppression was an illegal warrantless arrest, and observing that Baldwin could simply file and litigate another pretrial motion specifically raising Rule 502 as a basis for suppression.  **See** N.T., 9/23/21, at 5-7.  As such, the court declined to find waiver in the interests of judicial efficiency.  **Id**. at 7-8.

pursuant to Pa.R.A.P. 311(d),[6] and both the Commonwealth and the trial court complied with Pa.R.A.P. 1925.

The Commonwealth raises the following issue for our review: "Did the lower court err by suppressing [Baldwin's] firearm as the fruit of an alleged violation of [Rule] 502?" Commonwealth's Brief at 3.

Our standard of review of an order granting suppression is well-settled:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

**Commonwealth v. Miller**, 56 A.3d 1276, 1278-79 (Pa. Super. 2012) (citations omitted).

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect private citizens from unreasonable searches and seizures by government officials. **See Commonwealth v. Strickler**, 757 A.2d 884, 888 (Pa. 2000) (citing **United States v. Mendenhall**, 446 U.S. 544, 551 (1980)). However, not every encounter between a law enforcement officer and a citizen constitutes a

---

[6] Rule 311(d) permits the Commonwealth to appeal an interlocutory order in a criminal case where the Commonwealth certifies in the notice of appeal that the order appealed from will terminate or substantially handicap the prosecution. **See** Pa.R.A.P. 311(d).

seizure warranting constitutional protections.   *See Commonwealth v. Adams*, 205 A.3d 1195, 1199 (Pa. 2019).   As our Supreme Court has explained:

> We have long recognized three types of interactions that occur between law enforcement and private citizens.  The first is a mere encounter, sometimes referred to as a consensual encounter, which does not require the officer to have any suspicion that the citizen is or has been engaged in criminal activity.  This interaction also does not compel the citizen to stop or respond to the officer.  A mere encounter does not constitute a seizure, as the citizen is free to choose whether to engage with the officer and comply with any requests made or, conversely, to ignore the officer and continue on his or her way.  The second type of interaction, an investigative detention, is a temporary detention of a citizen.  This interaction constitutes a seizure of a person, and to be constitutionally valid police must have a reasonable suspicion that criminal activity is afoot.  The third, a custodial detention, is the functional equivalent of an arrest and must be supported by probable cause.  A custodial detention also constitutes a seizure.

> No bright lines separate these types of encounters, but the United States Supreme Court has established an objective test by which courts may ascertain whether a seizure has occurred to elevate the interaction beyond a mere encounter.  The test, often referred to as the "free to leave test," requires the court to determine whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. Whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person.

*Id*. 1199-2000 (internal citations, some quotations, and brackets omitted).

When police command a suspect to stop, an investigative detention occurs, otherwise known as a *Terry* stop.  *See Commonwealth v. Jackson*, 271 A.3d 461, 464 (Pa. Super. 2021); *see also Terry v. Ohio*, 392 U.S. 1

(1968). An encounter becomes a custodial detention or arrest when, under the totality of the circumstances, a police detention becomes so coercive that it functions as an arrest. *See Commonwealth v. Watkins*, 750 A.2d 308, 312 (Pa. Super. 2002). A number of factors will determine if a detention has become an arrest, including "the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions." *Id*. The fact that police officers have drawn their firearms when conducting a stop does not, *per se,* convert an investigatory detention into an arrest. *See Commonwealth v. Johnson*, 849 A.2d 1236, 1238-39 (Pa. Super. 2004); *see also Commonwealth v. Dix*, 207 A.3d 383, 388 (Pa. Super. 2019) (holding that a police stop was an investigative detention rather than a custodial detention when two police officers approached the defendant with their guns drawn and ordered him to place his hands on the roof of his truck); *Commonwealth v. Albert*, 767 A.2d 549, 552 (Pa. Super. 2001) (holding that when the officer approached the defendant with his gun drawn and yelled for the defendant to stop, an investigatory detention, not a custodial detention, occurred); *Commonwealth v. Dennis*, 433 A.2d 79, 80 n.5 (Pa. Super. 1981) (holding that "it cannot be said that whenever police draw weapons the resulting seizure must be deemed an arrest rather than a stop").

In the instant matter, the Commonwealth contends that an investigative detention, and not an arrest, occurred when Baldwin was ordered to stop and get down on the ground.[7] The Commonwealth further contends that, because Baldwin placed his firearm on the sidewalk during an investigative detention, Rule 502 does not compel suppression of the firearm. Instead, the Commonwealth asserts that the officers were entitled to seize the firearm under the "plain view" doctrine.[8]

The trial court considered the Commonwealth's issue and concluded that it lacked merit. The court reasoned:

> When [Baldwin] was handcuffed, face down on the sidewalk, with two police officers with guns drawn standing over him, he certainly was not free to leave. [Baldwin] was subjected to the actual control and custody of the police at this moment. [Baldwin] was placed in the custody of Officers Kovacs and Braun and

---

[7] Baldwin asserts that the Commonwealth is precluded from making this argument based on the district attorney's concession at the suppression hearing that an arrest occurred at the time the officers exited their vehicle with their weapons drawn and ordered Baldwin to stop. However, as explained above, the suppression record contains no evidence that Officer Braun's weapon was ever drawn or that Officer Kovacs emerged from the police car with his weapon drawn. Moreover, the determination as to whether an arrest occurred presents a legal question. *See Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (holding that the question of whether a seizure occurred is a pure question of law subject to plenary review). Thus, in addressing that legal question, this Court is not bound by oral arguments made, or positions taken, by counsel at the suppression hearing. Instead, this Court must consider the factual evidence presented at the suppression hearing.

[8] The "plain-view" doctrine permits the warrantless seizure of an object when: (1) an officer views the object from a lawful vantage point; (2) it is immediately apparent to him that the object is incriminating; and (3) the officer has a lawful right of access to the object. *See Commonwealth v. Heidelberg*, 267 A.3d 492, 504 (Pa. Super. 2021) (*en banc*).

subjected to their complete control before the arrival of the identifying witness. The encounter between [Baldwin] and the arresting officers went from an investigatory detention to an arrest once the officers drew their weapons and physically restrained [Baldwin].

\* \* \* \*

Based on the flash description relayed by Officer Manzo, the arresting officers had reliable information to indicate that [Baldwin] discharged a firearm into the ceiling of the front room at 4603 Germantown Avenue and that he was carrying the firearm as he left the residence towards a beer deli he frequented. At most, the arresting officers had probable cause to believe that [Baldwin's] behavior amounted to [REAP], a misdemeanor not committed in their presence. The arresting officers violated Rule 502 when they arrested [Baldwin] without a warrant, based on the probable cause that he committed REAP outside of their presence. No statutory exceptions for this warrantless arrest apply in this situation.

\* \* \* \*

The appropriate remedy for the violation of Rule 502 in the present case is the exclusion of the gun from evidence because the violation implicates fundamental constitutional concerns.

Trial Court Opinion, 12/10/21, at 9, 10, 12 (footnote omitted).

Based on our review, we conclude that the suppression court's ruling is not supported by the record. The undisputed evidence presented by the Commonwealth consists of the following. Officer Manzo responded to a report that a black male discharged a firearm into the ceiling of a residence on Germantown Avenue. *See* N.T., 8/9/21, at 6. Upon Officer Manzo's arrival at the residence, Ms. Brisco identified the shooter as Baldwin, whom she described as "a 5'8["] black male with a dark complexion, wearing a red shirt, plaid shorts, black socks, . . . bedroom slippers" and "a black revolver in his

- 9 -

waistband." *Id*. at 7-8. Ms. Brisco told Officer Manzo that Baldwin, whom she had known since he was a child, fled southbound on Germantown Avenue and noted that he frequented a beer deli near the intersection of 20th Street and Windrim Avenue. *Id*. at 8. Officer Manzo observed a bullet hole in the ceiling of the residence. *Id*. Approximately three to five minutes after arriving at the residence, Officer Manzo relayed a flash description of Baldwin over police radio which included Baldwin's name and a description of what he was wearing; namely, a red t-shirt, plaid pants, black socks, and bedroom slippers. *Id*. at 10, 11. The flash description indicated that Baldwin was a black male, with a dark complexion and armed with a small black revolver, and that he fled southbound on Germantown Avenue and may be in the area of 20th and Windrim Avenue near a beer deli he frequents. *Id*. at 11, 19, 20, 21. Shortly thereafter, Officers Kovacs and Braun responded to the flash description and encountered an individual matching the description of Baldwin on North 20th Street, approximately one-half mile from Germantown Avenue and in the approximate area of the beer deli near 20th Street and Windrim Avenue. *Id*. at 16-17, 28. The individual was wearing a red shirt, plaid shorts, black flip-flops, and had a handgun in his waistband. *Id*. at 23. Officers Kovacs and Braun were fully uniformed and in a marked patrol car. *Id*. at 22. With his weapon drawn, Officer Kovacs ordered Baldwin to stop and Baldwin ignored him. *Id*. at 23, 30. When Officer Kovacs repeated the command to stop, Baldwin removed the firearm from his waistband and placed it on the sidewalk.

*Id*. at 23, 30.[9]  Officer Kovacs then ordered Baldwin to lay on the sidewalk, and Baldwin complied.  *Id*.  Officer Kovacs then placed Baldwin in handcuffs and recovered the firearm, which was loaded with four live rounds inside.  *Id*. at 24.

At the time Baldwin removed the firearm from his waistband and placed it on the sidewalk, Officer Kovacs had twice ordered him to stop, thereby subjecting Baldwin to an investigative detention.  Critically, however, the officers had not yet handcuffed Baldwin.  Accordingly, even assuming that the trial court was correct in concluding that an arrest occurred when the officers handcuffed Baldwin, the record reflects that he placed the firearm on the sidewalk *before* he was handcuffed.  Thus, by the trial court's own logic, Baldwin placed the firearm on the sidewalk during an investigative detention and before an arrest occurred.[10]

Moreover, as explained above, the fact that Officer Kovacs had his service weapon drawn when ordering Baldwin to stop does not, without more,

_____

[9] Baldwin contends that he removed the firearm from his waistband "as he was lying down" on the sidewalk.  *See* Baldwin's Brief at 9.  However, Baldwin presented no evidence at the suppression hearing to contradict the sequence of events presented by Officer Kovacs, who testified that Baldwin placed the firearm on the sidewalk before he lowered himself to the sidewalk.  Consequently, Officer Kovacs' testimony, when read in the context of the entire record, remains uncontradicted.  *See Miller*, 56 A.3d at 1278-79.  In any event, Baldwin does not dispute that he placed the firearm on the sidewalk before he was handcuffed.

[10] We are not asked to decide, and therefore make no ruling as to whether the officers had reasonable suspicion to initiate an investigative detention.

elevate the encounter to an arrest. *See Johnson*, 849 A.2d at 1238; *see also Dix*, 207 A.3d at 388; *Albert*, 767 A.2d at 552; *Dennis*, 433 A.2d at 80 n.5. To make such an assessment, the totality of the circumstances must be considered. *See Watkins*, 750 A.2d 308, 312.

In the instant matter, the officers were requesting an individual to stop who matched the detailed physical description, and was in the location frequented by, an armed suspect who had recently discharged a weapon in a residence. Officer Kovacs specifically testified that Baldwin was "wearing" a firearm in his waistband. N.T., 8/9/21, at 23. Thus, a limited show of force by Officer Kovacs was an entirely appropriate precaution when attempting to stop an individual who was armed with a gun that the officers believed he had already unlawfully used. *See Johnson*, 849 A.2d at 1237 (holding that, when initiating the subject investigative detention, "not only was it proper for [the officers] to draw their weapons, but it would have been imprudent and dangerous *not* to draw their weapons, considering the danger") (emphasis in original). "While we ask our police officers to take risks, we do not ask them to be suicidal." *Id*. at 1239.

Considering the totality of the circumstances, these factors weigh in favor of a conclusion that Baldwin was subjected to an investigatory detention and not an arrest at the time he placed the firearm on the sidewalk. While Officer Kovacs drawing his weapon was a forcible tactic, none of the other factors indicates that an arrest had occurred when Baldwin divested himself

of the firearm. Thus, Rule 502 was not implicated at the point in time when Baldwin placed the firearm on the sidewalk.[11] We therefore conclude that the suppression court erred in ruling that the firearm was obtained pursuant to a warrantless arrest in violation of Rule 502. Accordingly, we reverse the suppression order and remand for further proceedings.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/12/2022

---

[11] Given the narrow question presented for our review, we make no ruling as to when an arrest occurred or whether Rule 502 was implicated at the specific point in time when Baldwin was arrested. Rather, we merely hold that no arrest had, as yet, occurred at the time Baldwin placed the firearm on the sidewalk.